Ron SMITH; Tony Bruin; Carl
Hendricks; and Terry
Conner, Appellants,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2006–CA–000659–DG.

Court of Appeals of Kentucky.

March 23, 2007.

Stefanie Durstock, Florence, William Knoebel, Burlington, Steven N. Howe, Dry Ridge, KY, for appellants.

Edward J. Lorenz, Williamstown, KY, for appellee.

Before COMBS, Chief Judge; MOORE and NICKELL, Judges.

*OPINION*

MOORE, Judge.

Appellants Ron Smith, Tony Bruin, Terry Conner, and Carl Hendricks appeal the Grant Circuit Court's order dismissing their consolidated appeal of the district court's order denying their motions to suppress the evidence obtained against them during individual traffic stops. Appellants were stopped separately at a sobriety checkpoint set up by the Kentucky State Police (KSP), and they were each charged with Driving Under the Influence of Alcohol or Drugs (DUI). A joint hearing was held on their separate motions to suppress, and their motions were denied. Appellants then entered conditional guilty pleas to the charges against them. The guilty pleas were conditional because Appellants wanted the opportunity to appeal the order denying their motions to suppress. After a careful review of the record, we affirm the Grant Circuit Court's order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 18, 2005, after a racing event at the Kentucky Speedway in Warsaw, Kentucky, the KSP set up a checkpoint in Grant County at the three-way intersection of Kentucky Highway 467, Jonesville–Folsom Road, and Warsaw Road. The purpose of the checkpoint was to "enhanc[e] traffic safety and to try to reduce fatalities during the summer months," as part of the KSP's "Hundred Days of HEAT Campaign." As part of the "Hundred Days of HEAT Campaign," KSP Troopers "were directed to do road checks, saturated patrol, [and] look for violators, to reduce the amount of fatalities during the Hundred Days of HEAT, which is the deadliest period in the year for fatalities in Kentucky." In 2005, the Hundred Days of HEAT Campaign began on the 6th of June.

The KSP has a policy for establishing and conducting traffic checkpoints. The policy is known as General Order OM–E–4.[1]

1. KSP General Order OM–E–4 states, in pertinent part, as follows:
A. The following guidelines shall be followed when **establishing** traffic safety checkpoint locations:
1. Post supervision shall establish and maintain a list of authorized traffic safety checkpoints and the justification for these checkpoint locations.

2. Traffic safety checkpoints shall not be held at locations other than those on the list, except under extenuating circumstances.
3. Locations of traffic safety checkpoints shall be selected based on considerations of safety and visibility to the public. Traffic safety checkpoints shall only be established

Two weeks before setting up the checkpoint at issue, KSP Sergeant Scott Miller obtained information regarding where the pre-approved locations for roadblocks were, and he learned that Kentucky Highway 467 was on that pre-approved list.

on roadways with clear visibility in all directions of travel.

4. Officers shall consider the weather condition and its adverse effects on officers and public safety when establishing a traffic safety checkpoint.

5. The determination of where and when a traffic safety checkpoint will be held shall bear a reasonable and articulable relationship to a public safety or traffic violation problem that has been experienced or is anticipated in a particular location.

6. Non-supervisory officers may request to establish traffic safety checkpoints at approved locations and times consistent with the above guidelines.

7. Post supervisors shall note the locations, approximate times and officer-in-charge of the traffic safety checkpoints on the post work schedule.

8. Media announcements shall be made periodically to inform the public that traffic safety checkpoints would be established in the area. The specific locations and times need not be announced.

B. The following procedures shall be followed when **conducting** a traffic safety checkpoint:

1. Traffic safety checkpoints shall be utilized to enforce the laws relating to:

  a. Motor vehicle equipment safety;

  b. Licensing of drivers;

  c. Registration of motor vehicles; and

  d. Operation of motor vehicle while under the influence of intoxicants.

2. The decision to conduct a traffic safety checkpoint must be approved by a supervisor.

3. Assigned personnel shall conduct traffic safety checkpoints at the scheduled time and location unless:

  a. Other law enforcement activities obligate the officer(s);

  b. There are extenuating circumstances that make the detail unreasonable; or

  c. A supervisor cancels the detail.

4. Traffic safety checkpoints may be conducted by one or more uniformed officer(s) and shall include a supervisor **OR** an officer designated by a supervisor as the officer-in-charge to monitor the traffic safety checkpoint.

5. Traffic safety checkpoints with traffic volume too great for effective monitoring by a single officer shall be conducted by a sufficient number of officers to ensure a safe and efficient operation of the traffic safety checkpoint and minimal disruption to the public.

6. Traffic safety checkpoints shall include uniformed officers. Marked vehicles, with blue lights operating, shall be used at all scheduled traffic safety checkpoints.

7. All officers conducting a traffic safety checkpoint **shall** wear their agency-issued reflective safety vest.

8. All vehicles that pass the checkpoint shall be checked unless the officer is involved in investigating or enforcing an observed or suspected violation of the law, or unless the volume of traffic creates congestion.

9. Should the officer(s) be unable to check each vehicle due to enforcement obligations or traffic congestion, all vehicles shall be passed through the checkpoint until one or more officer(s) becomes available for an orderly check of traffic. In these circumstances, a traffic stop shall not be made unless there is an observed violation of traffic or criminal law or a reasonable and articulable suspicion of some violation prior to the stop.

10. Each motorist stopped should be requested to present his/her operator's license, registration, and proof of insurance.

11. The vehicle may be inspected for obvious safety defects and registration violations. Any apparent or suspected violation of a traffic or criminal law may also be investigated and enforced.

12. If the officer detects any violation, the motorist may be directed to a nearby location out of the traffic flow where the appropriate enforcement action shall be taken.

13. All motorists are to be treated courteously, and are to be promptly allowed to proceed unless a violation is observed.

14. Officers participating in traffic safety checkpoints shall insure their arrival and departure times are logged on their timecard.

Sergeant Miller drove to Kentucky Highway 467 and found a safe place where the KSP could set up the checkpoint on June 18, 2005. The place he selected was within the mile posts of the pre-approved location for conducting checkpoints on that road. Sergeant Miller testified at Appellants' Suppression Hearing that a press release was sent on June 6, 2005, "to all media outlets" statewide in regard to the Hundred Days of HEAT Campaign and that the commercials and announcements concerning the campaign ran on television and radio stations. Therefore, the checkpoint was properly established under General Order OM–E–4, and Appellants do not argue to the contrary.

On June 18, 2005, the checkpoint was set up, and Sergeant Miller appointed Trooper Chad Mills as the officer in charge at the checkpoint. Id. at 116. Trooper Mills testified that the troopers set up the checkpoint, keeping in mind the safety of the motorists who would be driving through it, so that the motorists would be able to see the checkpoint from hundreds of feet away, and they would have an adequate amount of time to stop.

Trooper Mills testified that every vehicle coming through the checkpoint was stopped, until he determined, based on his experience, that it was no longer safe for the motorists due to the backed-up traffic caused by the checkpoint. At this point, the checkpoint was shut down, and the troopers allowed the traffic to "thin out until all vehicles were gone." In fact, because of unsafe backups, the checkpoints were stopped two-to-four times over a two-to-three hour period. Once the backups were eliminated each time, the troopers restarted the checkpoints and a new traffic stop was initiated, wherein an entire group of vehicles was stopped. These vehicles were not chosen randomly for a stop, and there was no exercise of discretion involved in choosing which vehicles from the group to stop.

Appellants, driving separately, were each stopped at the checkpoint. After failing field sobriety tests, Appellants were respectively charged with DUI and arrested. They each moved to suppress evidence obtained during the traffic stops. Appellants argued that this evidence should be suppressed because the checkpoint was unconstitutionally conducted due to the discretionary decisions made by Trooper Mills to stop and restart the checkpoint multiple times. Appellants asserted that the exercise of discretion by Trooper Mills was unconstitutional.

■ A joint suppression hearing[2] was held concerning Appellants' respective motions, and the Grant District Court denied their motions.[3] Appellants then entered conditional guilty pleas to the DUI charges against them, reserving the right to appeal the district court's order denying their motions to suppress.

As a matter of right, Appellants appealed the district court's order to the Grant Circuit Court, and that court dismissed their appeal. The circuit court found "that

**2.** We note that the transcript of Appellants' suppression hearing reflects that the hearing was held in the Grant Circuit Court and that the presiding judge was a circuit judge. However, the hearing was actually conducted in the Grant District Court, and the presiding judge was James Purcell, a district judge.

**3.** We have not been provided a copy of the district court's order denying Appellants' motions to suppress. Therefore, we are uncertain of the district court's reasons for denying their motions. Nevertheless, we will not disturb a correct decision by a lower court, even if the court provided an incorrect or insufficient reason for its decision. See Nall v. Thomas, 225 Ky. 610, 9 S.W.2d 727, 730 (App.1928).

the procedure followed by the officer in charge at the scene on the night in question was entirely reasonable and [did] not violate either the spirit or the letter of the cases cited by the parties regarding improper [checkpoints]." The circuit court then remanded the case to the district court to allow the district court to execute its judgment against each Appellant.

Appellants are now before this court on discretionary review. They assert the same claim that they raised in the circuit court, i.e., that the checkpoint was unconstitutional because the state trooper in charge of conducting the checkpoint exercised his discretion in conducting the checkpoint by stopping and restarting the checkpoint multiple times.

## II. ANALYSIS

■ It is well established that stopping motorists at a traffic checkpoint constitutes a seizure under the Fourth Amendment of the United States Constitution. *See Commonwealth v. Buchanon,* 122 S.W.3d 565, 568 (Ky.2003), *as modified* (Ky.2004). The question then becomes whether the seizure was reasonable, "which requires a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.* (internal quotation marks and citation omitted).

■ The purpose of the checkpoint at issue was to "[r]educe accidents, detect DUIs, [conduct] vehicle safety inspections, [and detect] licensing [and] other violations." Terry Conner's trial record at 24. Clearly, these are matters of public concern that are greatly served by the type of seizure occurring at a checkpoint. *See generally Buchanon,* 122 S.W.3d at 568. In *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d

412 (1990), the United States Supreme Court held that sobriety checkpoints are constitutional. *Sitz,* 496 U.S. at 447, 110 S.Ct. 2481. Additionally, in *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Supreme Court implied that if a checkpoint was established for the purpose of ensuring that motorists were licensed and that cars were registered, the checkpoint would be constitutional, if officers were not permitted to exercise their discretion while conducting the checkpoint. *See Prouse,* 440 U.S. at 663, 99 S.Ct. 1391.

■ For a checkpoint to be constitutional, it must be executed pursuant to a systematic plan, and the officers conducting the stop should not be permitted to exercise their discretion regarding specifically which vehicles to stop. *See Steinbeck v. Commonwealth,* 862 S.W.2d 912, 913 (Ky. App.1993). This ensures that there is limited interference with the individual's liberty. *See generally Buchanon,* 122 S.W.3d at 568. As previously noted, the KSP has a Traffic Checkpoint Policy, referred to as OM–E–4. In *Commonwealth v. Bothman,* 941 S.W.2d 479 (Ky.App. 1996), this Court discussed an officer's noncompliance with OM–E–4 in establishing a checkpoint and held:

> [E]ven if the checkpoint was established in contradiction to the express language of OM–E–4, ... the dispositive question is whether the establishment of the checkpoint and the subsequent discovery and seizure of the evidence passes constitutional muster. Technical noncompliance with OM–E–4, which does not have the force of law, does not inexorably lead to the conclusion that the establishment of the checkpoint was violative of the constitutions of the United States or of the Commonwealth. In general, a checkpoint must be established in such a manner as to avoid the "unconstrained

discretion" inherent in random stops, ... and must be reasonably calculated to protect public safety.

*Bothman,* 941 S.W.2d at 481 (citations omitted).

Upon review of the testimony presented at the suppression hearing in this case, we hold that the checkpoint at issue was constitutional. Although Appellants argue that, pursuant to *Prouse,* Trooper Mills's decisions to stop and restart the checkpoint multiple times were unconstitutional exercises of his discretion, their argument is misplaced. It is important to note that in *Prouse,* the vehicle was not stopped as part of a pre-approved traffic checkpoint. Rather, the patrolman chose which specific vehicles he "would stop for a spot check." *Kinslow v. Commonwealth,* 660 S.W.2d 677, 678 (Ky.App.1983) (discussing *Prouse,* 440 U.S. at 648, 99 S.Ct. 1391). The patrolman in *Prouse* stopped the vehicle merely to check the motorist's license and car registration, without having previously observed any violations of the law or suspicious activity regarding the vehicle or its driver, and without having first established an approved checkpoint. *See Prouse,* 440 U.S. at 650, 99 S.Ct. 1391. The Supreme Court ultimately condemned the fact that the officer in *Prouse* had exercised his "unconstrained discretion" in choosing individual vehicles to stop and check. *Kinslow,* 660 S.W.2d at 678 (internal quotation marks and citation omitted). The patrolman in *Prouse* did not act pursuant to any policies or guidelines established by the police department when he chose which vehicles to stop, resulting in an unconstitutional exercise of unfettered discretion. *See Prouse,* 440 U.S. at 650, 663, 99 S.Ct. 1391.

This Court has held that "inherent in all constitutional checkpoints is constrained discretion of officers at the scene, [but] the checkpoint [must] be established pursuant to some sort of systematic plan." *Buchanon,* 122 S.W.3d at 569 (citations omitted). In the present case, the checkpoint met this requirement.

The checkpoint was executed pursuant to KSP Policy OM–E–4, Guideline B. The purpose of the checkpoint at issue was to "[r]educe accidents, detect DUIs, [conduct] vehicle safety inspections, [and detect] licensing [and] other violations." Conner's T.R. at 24. The decision to perform the checkpoint was approved by a supervisor, i.e., Sergeant Miller, and multiple troopers conducted the checkpoint at the scheduled time and location. Trooper Mills was designated by Sergeant Miller to be the officer in charge during the checkpoint. The troopers executing the checkpoint wore their uniforms and reflective safety vests, and all lights on marked vehicles were illuminated. While the checkpoint was in operation, every vehicle that came through it was stopped. However, when the traffic congestion became so great that the checkpoint was no longer safe for motorists, all vehicles were permitted to pass through it "until all vehicles were gone." Then, the troopers restarted the checkpoint and stopped a group of vehicles until the congestion again caused a safety hazard.

Accordingly, specific vehicles were not targeted for stops, and the stops were not randomly conducted. When a vehicle was stopped at the checkpoint, the trooper performing the stop checked to ensure that the driver's license, insurance, and registration were valid. Finally, if a trooper suspected that a traffic or criminal law had been violated, the trooper investigated the matter and made arrests as warranted. Therefore, the checkpoint at issue was conducted in accordance with OM–E–4. *See* KSP General Order OM–E–4, Guideline B.

Although Trooper Mills, as the officer in charge, may have made the decision to stop and restart the checkpoint multiple

times, he did so because the traffic passing through the checkpoint had become congested, thus creating concern for the safety of the motorists. Pursuant to OM–E–4 Guideline B § § 8 and 9, all vehicles passing through a checkpoint must be checked, unless the traffic creates congestion, in which case all vehicles must be passed through the checkpoint until the officers are again able to "orderly check [the] traffic." Therefore, the checkpoint in the present case was conducted as it should have been under OM–E–4 and, contrary to Appellants' assertion, Trooper Mills's decisions to stop and restart the checkpoint were not exercises of his discretion. Rather, those decisions were made in accordance with policy OM–E–4, which was a systematic plan for conducting checkpoints. *See Steinbeck*, 862 S.W.2d at 913. Thus, the checkpoint at issue was constitutionally conducted, and Appellants' claims are without merit.

Accordingly, the order of the Grant Circuit Court is affirmed.

ALL CONCUR.