Charles PULLEY, Appellant

v.

COMMONWEALTH of Kentucky, Appellee

NO. 2013–CA–001740–DG

Court of Appeals of Kentucky.

RENDERED: JANUARY 15, 2016; 10:00 A.M.

---

4. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Briefs for Appellant: Samuel N. Potter, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Kentucky.

Brief for Appellee: Billy N. Riley, Livingston County Attorney, Smithland, Kentucky.

BEFORE: DIXON, KRAMER AND THOMPSON, JUDGES.

## OPINION

THOMPSON, JUDGE:

Charles Pulley was charged with menacing and second-degree disorderly conduct. Pulley confronted police at a traffic safety checkpoint after an officer removed Pulley's firearm from his vehicle and checked the firearm's serial number. Following a jury trial in the Livingston District Court, Pulley was acquitted of menacing but convicted of second-degree disorderly conduct. He appealed to the Livingston Circuit Court arguing the district court erroneously denied his motion to suppress and his motion for a directed verdict. The circuit court affirmed. We granted discretionary review.

Pulley filed a motion to suppress all evidence acquired after the traffic safety checkpoint stop, arguing that the extension of the stop to check his firearm's serial number resulted in an illegal search and seizure where the officer lacked reasonable suspicion that a crime had been committed. After a hearing, the district court found the officer was entitled to remove the firearm from Pulley's possession for his own safety and the minimal extension of the stop to check its serial number in a crime database did not rise to the level of a constitutional violation and denied Pulley's motion to suppress.

At trial, the testimony established that on the evening of August 31, 2012, Kentucky State Police (KSP) officers were conducting a planned and announced traffic safety checkpoint on Highway 60, at the base of the Tennessee River Bridge in Livingston County, Kentucky. This portion of the highway is not situated near any homes, businesses or other places where people are likely to be present. Beginning at 9:34 p.m., officers began stopping all motorists to check their licenses, registration and insurance. Trooper Eric Fields was stopping traffic in one direction and Lieutenant Brent White was stopping traffic in the other direction.

Pulley was stopped shortly after the checkpoint began. His wife Kathy and their two-year-old son were also in the vehicle. Kathy testified they were stopped at about 9:30 or 9:35 p.m. According to Pulley and Kathy, Trp. Fields asked Pulley for his license, proof of insurance and registration, inspected these documents and returned them. According to Kathy, after Trp. Fields gave Pulley his documents back, he said "everything is good."

Trp. Fields then noticed Pulley's semi-automatic handgun on the vehicle's center console arm rest. He asked: "What is that?" When Pulley answered that it was his gun, Trp. Fields ordered Pulley out of the vehicle. After Pulley exited the vehicle, Trp. Fields reached in the vehicle and removed the firearm. Trp. Fields testified he had not finished his stop when he removed the firearm.

Pulley testified he had previous negative experiences with the police detaining him to check his firearm's registration and feared another lengthy delay. Therefore, he told Trp. Fields he would not consent to him running his firearm's registration. Trp. Fields ordered Pulley to drive his vehicle to the side of the road and Pulley complied.

Trp. Fields testified he removed and secured the firearm for his own safety. He testified Pulley had been fully cooperative with the traffic safety stop. He had no reason to be suspicious of Pulley or to suspect that the firearm was illegal. He

would not have told Pulley to pull his vehicle over to the side of the highway if he had not seen the firearm.

Trp. Fields called dispatch and relayed Pulley's vehicle plate number, his driver's license number and the firearms's serial number. After Trp. Fields completed the checks and determined Pulley was fully in compliance with the law, he handed the then unloaded firearm to Kathy and requested it not be reloaded until they were down the road. Pulley and Kathy testified once the firearm was removed the stop lasted fifteen to twenty minutes, while Trp. Fields testified it took no more than six to seven minutes.

After Pulley was cleared to leave, he requested Trp. Fields provide him with his name and badge number. Pulley planned to make a formal complaint about the police running his firearm's serial number through the crime database and delaying him. Trp. Fields provided this information but also suggested Pulley talk to his supervisor, Lt. White. After Pulley stated he wanted to speak with Lt. White, Trp. Fields took the firearm back from Pulley, and crossed the highway to speak with Lt. White. The checkpoint was temporarily halted at this time. Both officers crossed back over. Lt. White approached and asked Pulley to exit the vehicle and they proceeded to talk by the trunk of the vehicle while Trp. Fields remained by Kathy on the passenger side.

At first, the conversation between Pulley and Lt. White was calm. Pulley attempted to shake Lt. White's hand, but Lt. White refused to do so. After Lt. White asked him what the problem was, Pulley complained he had been detained for an unreasonable search. Lt. White told him the KSP's actions were entirely legal.

Meanwhile, Trp. Fields was talking with Kathy. He handed her the unloaded firearm and explained that he was pro-gun.

According to Pulley, his discussion with Lt. White became heated because he would not concede Lt. White was correct. According to Lt. White, Pulley was arguing, becoming agitated and did not understand the law. Trp. Fields testified Pulley was yelling about his rights, how this was not a proper traffic safety checkpoint and his gun rights. Pulley and Lt. White both testified that Lt. White told Pulley it was the KSP's practice to run checks on any firearm encountered to determine if it was stolen and such practice was proper. Pulley disagreed. While Pulley was loud, he did not use any obscenities.

Lt. White testified Pulley continued arguing and acting in an aggressive manner by trying to move into his personal space, "squaring off" and pointing his finger above and toward Lt. White's head in a threatening manner. Lt. White then ordered Pulley to place his hands on the trunk. Pulley complied but continued to argue and then removed his hands from the vehicle. Trp. Fields testified he saw Pulley remove his hands several times.

According to Lt. White, Pulley was handcuffed for Lt. White's protection, and to calm him down. Lt. White told Pulley "you're not under arrest, you are detained." Pulley began yelling about being arrested. Lt. White repeated he was being detained and not arrested, but later told him he was arrested. His citation was issued at 9:50 p.m. After Pulley's arrest, the traffic safety checkpoint was halted for the evening.

Lt. White and Trp. Fields testified consistently that Pulley was agitated and arguing loudly while acting in an aggressive manner. Kathy testified she heard parts of the exchange through her cracked window, but when she heard them get louder and tried to open the vehicle door, Trp. Fields would not allow her. She heard

Pulley ask why he was being detained and whether he was going to be arrested. Kathy testified Lt. White was much louder than Trp. Fields had been.

The only evidence of public alarm was that another motorist stopped and Pulley's family became upset. Lt. White testified that while Pulley was arguing with him, one vehicle stopped and looked but he waved the vehicle on.

Pulley moved for a directed verdict on both charges, which the district court denied. The jury acquitted Pulley of menacing but convicted him of disorderly conduct in the second degree and recommended a fine of fifty dollars. Sentence was imposed consistent with the recommendation.

■ Pulley argues his roadside detention was illegally extended because police had no reasonable suspicion that he was unlawfully possessing his firearm. He argues any extension of the stop to see if the firearm was listed in a crime database was unjustified and directly contributed to the disorderly conduct charge. Therefore, he argues the circuit court erred in affirming the district court's denial of his motion to suppress his conduct subsequent to the improper extension of his detention.

■ Under section one of the Kentucky Constitution, people are declared to "have certain inherent and inalienable rights[.]" These include: "Seventh: The right to bear arms in defense of themselves and of the State, subject to the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons." *Id.* As interpreted by Kentucky Courts, this right "is an exemplification of the broadest expression of the right to bear arms." *Holland v. Commonwealth*, 294 S.W.2d 83, 85 (Ky.1956). In Kentucky, a person has the right to carry a firearm openly and, so long as the fire-

arm is in full view, no one may question the person's right to do so. *Id.* Bearing an unconcealed weapon is not an offense. *Skidmore v. Commonwealth*, 311 Ky. 176, 178, 223 S.W.2d 739, 740 (1949). Vehicle owners may "transport weapons unconcealed in the front seat ... of the motor vehicle." *Mohammad v. Commonwealth*, 202 S.W.3d 589, 590 (Ky.2006). The presence of Pulley's unconcealed firearm on top of the center console inside his vehicle was entirely legal.

■ Under the Fourth Amendment, motorists may be validly stopped at traffic safety checkpoints to determine safe driving practices but such checkpoints cannot be used for general crime control. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 37–38, 41–44, 121 S.Ct. 447, 452, 454–55, 148 L.Ed.2d 333 (2000); *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979); *Singleton v. Commonwealth*, 364 S.W.3d 97, 102–05 (Ky.2012). "For a checkpoint to be constitutional, it must be executed pursuant to a systematic plan, and the officers conducting the stop should not be permitted to exercise their discretion regarding specifically which vehicles to stop." *Smith v. Commonwealth*, 219 S.W.3d 210, 214 (Ky. App.2007). "[I]nherent in all constitutional checkpoints is constrained discretion of officers at the scene[.]" *Commonwealth v. Buchanon*, 122 S.W.3d 565, 569 (Ky.2003), *as amended* (2004). Among the factors to be considered in determining the reasonableness of the stop is the length and intrusiveness of the stop:

> Motorists should not be detained any longer than necessary in order to perform a cursory examination of the vehicle to look for signs of intoxication or check for license and registration. If during the initial stop, an officer has a reasonable suspicion that the motorist has violated the law, the motorist should

be asked to pull to the side so that other motorists can proceed.

*Id.* at 571. *See also Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion); *Turley v. Commonwealth,* 399 S.W.3d 412, 423 (Ky.2013); *Epps v. Commonwealth,* 295 S.W.3d 807, 811–813 (Ky.2009).

 "The scope of activities permitted during an investigative stop is determined by the circumstances that initially justified the stop." *United States v. Obasa,* 15 F.3d 603, 607 (6th Cir.1994). Any additional investigation conducted must be "reasonably related in scope to the circumstances that justified the interference in the first place." *Epps,* 295 S.W.3d at 812 (citations omitted). *See People v. Lomas,* 349 Ill.App.3d 462, 473, 812 N.E.2d 39, 47–8, 285 Ill.Dec. 450 (2004) (running a criminal check on a passenger during a traffic stop which did not extend the length of the stop violated the Fourth Amendment because it changed the fundamental nature of the stop into a fishing expedition). "[A]ny subsequent detention is only constitutionally permissible if the officers had probable cause or reasonable suspicion to warrant prolonging the stop." *Commonwealth v. Bucalo,* 422 S.W.3d 253, 259 (Ky. 2013). *See Palmore v. United States,* 290 A.2d 573, 582–83 (D.C.1972), *aff'd* 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973).

Kentucky State Police General Order OM–E–4 authorizes the establishment of traffic safety checkpoints. It provides checkpoints are only to be used to enforce laws relating to motor vehicle equipment safety, licensing of drivers, registration of motor vehicles and operating motor vehicles while intoxicated. When a vehicle is stopped, the following provisions from OM–E–4(B) apply:

10. Each motorist stopped should be requested to present his/her operator's license, registration and proof of insurance.

11. The vehicle may be inspected for obvious safety defects and registration violations. Any apparent or suspected violation of a traffic or criminal law may also be investigated and enforced.

12. If the officer detects any violation, the motorist may be directed to a nearby location out of the traffic flow where the appropriate enforcement action shall be taken.

13. All motorists are to be treated courteously, and are to be promptly allowed to proceed unless a violation is observed.

OM–E–4 does not provide for any extension of the stop or seizure based on viewing an unconcealed firearm in a vehicle.

 The Commonwealth's argument that Trp. Fields was justified in his temporary seizure of Pulley's firearm for safety purposes is akin to the justification behind a *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), stop and frisk. Under *Terry,* an officer must have reasonable suspicion to believe the suspect is armed and dangerous, and may gain immediate control of a weapon, before conducting a weapons search for a protective purpose. *Knowles v. Iowa,* 525 U.S. 113, 118, 119 S.Ct. 484, 488, 142 L.Ed.2d 492 (1998); *United States v. Hensley,* 469 U.S. 221, 235, 105 S.Ct. 675, 683–84, 83 L.Ed.2d 604 (1985); *Adams v. Williams,* 407 U.S. 143, 146–47, 92 S.Ct. 1921, 1923–24, 32 L.Ed.2d 612 (1972). However, a *Terry* search may not be conducted to discover evidence of crime. *Adams,* 407 U.S. at 146, 92 S.Ct. at 1923.

 In states in which possession of an unconcealed firearm is legal, the mere observation or report of an unconcealed firearm cannot, without more, generate reasonable suspicion for a *Terry* stop

and the temporary seizure of that firearm. *Northrup v. City of Toledo Police Dept.,* 785 F.3d 1128, 1131–33 (6th Cir.2015); *United States v. Black,* 707 F.3d 531, 540 (4th Cir.2013); *United States v. Lewis,* 672 F.3d 232, 240 (3d Cir.2012); *United States v. Ubiles,* 224 F.3d 213, 217–18 (3d Cir. 2000); *State v. Williamson,* 368 S.W.3d 468, 480–81 (Tenn.2012); *St. John v. McColley,* 653 F.Supp.2d 1155, 1161–63 (D.N.M.2009); *United States v. Dudley,* 854 F.Supp. 570, 579–80 (S.D.Ind.1994). A firearm when combined with other innocent circumstances cannot generate reasonable suspicion because "it [is] impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." *United States v. Smith,* 263 F.3d 571, 594 (6th Cir.2001) (quoting *Karnes v. Skrutski,* 62 F.3d 485, 496 (3d Cir.1995) (abrogated on other grounds)). *See Black,* 707 F.3d at 540 (openly bearing a firearm where it is legal to do so, in a high crime area, cannot justify reasonable suspicion).

 An individual legally carrying a firearm is only armed, not "armed *and dangerous.*" *Northrup,* 785 F.3d at 1132 (citation omitted). Lawful possession of a firearm is insufficient to justify a suspicion that such a person has committed, is committing, or is about to commit a crime. *St. John,* 653 F.Supp.2d at 1161.

In *Black,* 707 F.3d at 540, the Government argued officers should be entitled to treat an openly armed man as a potential felon, justifying removal of his firearm to perform a record check because "it would be 'foolhardy' for the officers to 'go about their business while allowing a stranger in their midst to possess a firearm.'" The Fourth Circuit rejected this argument, explaining as follows:

> Being a felon in possession of a firearm is not the default status. More

importantly, where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention. Permitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states.

*Id.* See also *Northrup,* 785 F.3d at 1132.

In *People v. Granados,* 332 Ill.App.3d 860, 773 N.E.2d 1272, 266 Ill.Dec. 202 (2002), the Court determined the defendant's legal possession of firearms was not a sufficient basis to extend a traffic safety checkpoint stop so that the officer could obtain the defendant's firearm owner's identification card and confirm his valid possession of the firearms, explaining as follows:

> The traffic stop here concluded when the officer returned to defendant his driver's license, registration, and insurance card and stated that defendant was free to go. Because the initial purpose of the stop (the roadside check) had been completed and because the officer lacked any reasonable suspicion of illegal activity, we find that the subsequent detention of defendant's vehicle without reasonable suspicion was improper.

*Id.* at 865, 266 Ill.Dec. 202, 773 N.E.2d at 1276 (internal citation omitted).

We are not persuaded by the Commonwealth's argument that the purpose of the traffic safety stop was not concluded before Trp. Fields contacted dispatch to check Pulley's license and vehicle registration and, thus, also entering the serial number into a crime database the firearm's registration check among those other checks did not extend or change the nature of the traffic safety stop. It is undisputed that the course of the traffic safety stop changed once Trp. Fields saw Pulley's firearm. Trp. Fields testified that

Pulley was cooperative, his documents appeared to be in order and he had no reason to be suspicious of him. After Trp. Fields returned Pulley's driver's license, vehicle registration and insurance card, the purpose of the traffic safety stop was complete and Pulley should have been allowed to proceed. *See Turley,* 399 S.W.3d at 424 (determining an officer may not himself create the exigent circumstances that lead to a seizure without a warrant by illegally extending a stop).

Likewise, we are not persuaded that Pulley's additional detention, even if limited to only a few minutes, was constitutionally permissible where the purpose of the stop was changed into an investigation for general crime control. Unlike a traffic stop in which an officer's suspicion of an infraction could justify additional investigation (including checking the status of a driver's license and registration with dispatch) before issuing a traffic citation or a traffic safety stop in which reasonable suspicion emerging during the course of the stop could justify additional investigation, Trp. Fields lacked any justification for further investigation. Trp. Fields acted improperly by seizing Pulley and his firearm after the purpose for the stop concluded.

■■■■ The Commonwealth argues once Pulley was cleared to leave, his subsequent actions were sufficiently attenuated from any illegality as to not be fruit of any illegal detention, because Pulley decided to stay and argue. We agree that once a stop ceases to be coercive and becomes consensual any evidence obtained afterward is not fruit of the poisonous tree. *See id.* at 423.

Trp. Fields returned Pulley's weapon and Pulley was free to go when he asked Trp. Fields for identifying information and then spoke to his supervisor. Therefore, if Pulley's subsequent encounter with Lt. White was consensual, his argument for suppression must fail.

It could be argued that Pulley's subsequent encounter with Lt. White was not purely consensual once Trp. Fields yet again removed his firearm. *See Black,* 707 F.3d at 538 (determining when an officer approaches individuals for a consensual encounter but then sees one individual bearing a firearm in a legal manner, obtains the individual's firearm and secures it in his police vehicle, this indicates that individual is not free to leave); *United States v. McCain,* 556 F.2d 253, 255 (5th Cir. 1977) (determining passenger was restrained where she was only able to leave if she was willing to abandon her luggage). However, we do not need to resolve this issue.

In the typical suppression case, a defendant seeks the suppression of evidence of a *prior* crime discovered after an illegal search or seizure, or custodial interrogation without a *Miranda* warning. Pulley seeks suppression of all evidence of a *future* crime that occurred after an illegal search and seizure.

■■■■ Even if Pulley continued to be improperly detained at the time he committed a crime, he would not be entitled to suppression of the evidence of this crime. Whether or not an officer's actions constitute an illegal search, arrest or detention, our courts reject applying the exclusionary rule to prohibit evidence of a crime that takes place after such a prior illegality. *See Baze v. Commonwealth,* 965 S.W.2d 817, 821 (Ky.1997) (determining the unlawfulness of an arrest is not a defense to a prosecution for resisting arrest); *Commonwealth v. Johnson,* 245 S.W.3d 821, 823–25 (Ky.App.2008) (determining the exclusionary rule does not apply to suppress evidence of assault on an officer after an illegal entry). Therefore, the district court was correct to deny Pulley's motion to

suppress and the circuit court properly affirmed.

█ Pulley also appeals from his conviction on the basis that the circuit court erroneously upheld the district court's denial of his motion for a directed verdict on the disorderly conduct charge. The Supreme Court of Kentucky set forth the directed verdict rule as well as the appellate court's standard of review in *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991):

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.
>
> On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

*See also Wilburn v. Commonwealth*, 312 S.W.3d 321, 323 (Ky.2010); *Hedges v. Commonwealth*, 937 S.W.2d 703, 707 (Ky. 1996).

KRS 525.060 sets out the elements needed for conviction of disorderly conduct in the second degree. The Commonwealth argued Pulley was guilty based upon KRS 525.060(1)(a), (b) and (d):

> (1) A person is guilty of disorderly conduct in the second degree when in a public place and with intent to cause public inconvenience, annoyance, or

alarm, or wantonly creating a risk thereof, he:

> (a) Engages in fighting or in violent, tumultuous, or threatening behavior;
>
> (b) Makes unreasonable noise;
>
> . . . .
>
> (d) Creates a hazardous or physically offensive condition by any act that serves no legitimate purpose.

The Kentucky Crime Commission/Legislative Research Counsel commentary to KRS 525.060 (emphasis added), further explains what conduct is intended to be criminalized:

> Under the provision, the actor must either intend to cause public inconvenience, annoyance or alarm or wantonly create a risk thereof. The statute is not a strict liability offense. KRS 525.060 requires "public" alarm. *Public is defined in KRS 525.010(2) as that which affects or is likely to affect a substantial group of persons....* The provision is not intended to include conduct which disturbs the peace and quiet of any "one" person....
>
> It is important to note that KRS 525.060 penalizes only behavior which is itself disorderly....
>
> ... It is intended to cover the most common types of misbehavior by which individuals can make a public nuisance of themselves, such as actual fights and behavior tending to threaten the public generally. It should again be stressed that the statute requires public alarm as distinguished from private alarm. For example, *a person may not be arrested for disorderly conduct as a result of activity which annoys only the police.* The statute is not intended to cover the situation in which a private citizen engages in argument with the police so long as the argument proceeds without offensively coarse language or conduct

which intentionally or wantonly creates a risk of public disturbance.

The Sixth Circuit in *Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 215–16 (6th Cir.2011) (internal citation omitted), noted:

> [A]s the commentary to [KRS] 525.060 makes clear, Kentucky law does not criminalize arguments and noise that disturb only police officers because such conduct does not risk *public* alarm.... Indeed, because the First Amendment requires that police officers tolerate coarse criticism, the Constitution prohibits states from criminalizing conduct that disturbs solely police officers.

*See Commonwealth v. Jones*, 880 S.W.2d 544, 546 (Ky.1994) ("The content of the noise, however distasteful, is not punishable.").

Having thoroughly examined the evidence presented at trial, the Commonwealth failed to present any evidence sufficient to establish Pulley's conduct was done "with intent to cause public inconvenience, annoyance, or alarm, or wantonly creating a risk thereof[.]" KRS 525.060(1)(a). While the highway was a public location, and vehicles were traversing it, there was no evidence that Pulley's conduct was "affecting or likely to affect a substantial group of persons" so as be affecting the "public." KRS 525.010(2).

The only persons who could observe the course of events between Pulley and Lt. White were the officers and Pulley's family, neither group qualify as members of the public. *See Kennedy*, 635 F.3d at 215–16 (police officer and city workers were not members of the public); *Nails v. Riggs*,

195 Fed.Appx. 303, 305, 309–310 (6th Cir. 2006) (defendant's husband and children were not members of the public). Although Lt. White testified a vehicle stopped and he waved it on, his testimony did not establish the driver stopped because alarmed, rather than believing a stop was required by the checkpoint, or simply stopping out of curiosity. Moreover, the occupants of a single vehicle are not "a substantial group of persons" and, thus, this single vehicle stopping cannot satisfy the definition of "public." There was no testimony that other motorists had a reaction to Pulley's conduct or that anyone else was near the highway. Additionally, as an unarmed person on foot, Pulley could not pose any danger to passing motorists. *See* KRS 525.060 cmt. (explaining this provision was intended to address behavior that threatened the public generally rather than only threatening a specific person). Having thoroughly examined the evidence as a whole and drawing the most favorable inferences for the Commonwealth, we determine it was clearly unreasonable for a jury to find Pulley guilty of disorderly conduct in the second degree.

Accordingly, we reverse the Livingston Circuit Court's decision affirming Pulley's conviction.

ALL CONCUR.