RENDERED: DECEMBER 16, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0099-DG

COMMONWEALTH OF KENTUCKY                                     APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                            NO. 2017-CA-1947
FULTON CIRCUIT COURT NO. 17-CR-00003

SHUNTRELL D. CONNER                                         APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**<u>AFFIRMING</u>**

We granted the Commonwealth's motion to review the Court of Appeals'
reversal of the trial court's denial of Shuntrell D. Conner's motion to suppress
evidence found in a drug dog sniff search during a traffic stop of the vehicle in
which Conner was a passenger. The Court of Appeals determined that the
investigating officer unconstitutionally extended the duration of the traffic stop
to accommodate the dog-sniff search; as such, the search was unlawful and
the trial court erred by denying the motion to suppress the evidence discovered
in the search. We agree and affirm the Court of Appeals' decision.

## I. BACKGROUND

Officer Brandon Mayo stopped the van in which Conner was a passenger.
During the stop, a drug dog alerted to the presence of drugs inside the van,

and officers searched it, uncovering 6.5 ounces of marijuana. The Commonwealth later charged Conner with trafficking in marijuana,[1] tampering with physical evidence,[2] possession of drug paraphernalia,[3] and being a first-degree persistent felony offender.[4]

Conner filed a motion to suppress all evidence discovered during the search. He argued that the traffic stop was unconstitutionally prolonged to obtain a drug sniff unrelated to the purpose of the traffic stop. As such, Conner argued that evidence seized during the search of the van should be suppressed as the fruits of an illegal seizure. The Commonwealth argued in response that Officer Mayo developed reasonable, articulable suspicion during the traffic stop, giving rise to an investigation into possible illegal drug activity. The trial court held an evidentiary hearing on the motion.

At the hearing, the Commonwealth called Officer Mayo as its only witness. He testified that, at 8:12 p.m. on November 12, 2016, he pulled over a silver van after it swerved in the road. Mayo recognized the van as one previously operated by Conner. This time, Joey Garmon operated the van, and Conner rode in the front passenger seat. When Officer Mayo approached the van, he recognized Conner from having pulled him over a couple of weeks before this incident. He testified that he learned during this earlier traffic stop

---

[1] Kentucky Revised Statutes (KRS) 218A.1421.

[2] KRS 524.100.

[3] KRS 218A.500(2).

[4] KRS 532.080.

2

that Conner was not supposed to be driving.[5]  Officer Mayo asked Garmon why he was swerving, and Garmon told him he swerved to miss a pothole.  Officer Mayo then asked for Garmon's license, proof of insurance, and registration, and he also collected Conner's license.

Officer Mayo testified that he returned to his cruiser and ran a records check of Garmon's license.  Officer Mayo stated that he "had heard previous that Mr. Conner was trafficking some type of dope, I had heard methamphetamines, at that time it sparked my interest to investigate further."  Officer Mayo testified that, while sitting in his cruiser, he observed Conner shoving a plastic bag underneath something in the backseat. Officer Mayo testified that, at this time, "it became an investigative stop for supposedly [sic] drugs."

At the hearing, the defense played footage of the traffic stop as captured on Officer Mayo's body camera.[6]  The video did not show Officer Mayo's first encounter with the van when he approached it and asked about Garmon's swerving.  At the beginning of the video, Officer Mayo was standing behind the stopped van, speaking with two other officers.  Officer Mayo told the other officers that "the passenger is supposed to be trafficking meth . . . he's got some boxes and shit back there."  Officer Mayo then checked his watch, noted the time was 8:15 p.m., and returned to the driver's side window of the van.

---

[5] Officer Mayo did not state why Conner was not supposed to be driving.

[6] The footage does not capture the entirety of the traffic stop, and the quality of the audio is poor.

He then said to Conner, "I need to talk to you for a minute brother, can you get out?" Conner explained that he recently had surgery, and he asked not to get out. When Garmon asked what was going on, Officer Mayo replied, "I just need to talk to him for a second." Garmon again asked whether there was a problem, and Officer Mayo replied, "yeah here's the problem" and explained that he had information about drugs.[7] Officer Mayo then asked whether there was anything in the van that he needed to know about, and Conner replied that he was moving his clothes. Officer Mayo then asked whether he could take a look, and Conner declined, explaining that it was not his van, and there was nothing but clothes in the back. Officer Mayo responded "I ain't [sic] worried about no clothes, . . . as long as there's no dope in here, I don't care." Conner again declined, stating that the van belonged to his friend, Michelle Martinez. Officer Mayo then said "I can get a dog up here, he can search, that's what I'm saying. It's up to you."

After Garmon declined the search and Officer Mayo asked about Conner's relationship with Martinez, Officer Mayo then stated, "All right, well give me a few minutes and we'll get the dog up here in a little bit." Officer Mayo then returned to his cruiser. This encounter—from the time Officer Mayo asked Conner to get out of the van so they can talk to the time he left the van's driver's side window—lasted about two minutes.

---

[7] Officer Mayo's words are hard to make out from the body-camera footage, but it is apparent that he tells Conner and Garmon that he has information about trafficking drugs.

4

When he returned to his cruiser, Officer Mayo requested a canine unit through his radio and ran a check on Garmon's license.[8] Officer Mayo testified that, while on the radio, he saw Conner shove something underneath something in the backseat. He then returned to the driver's side window of the van and asked Conner what he was moving in the backseat, and Conner replied that he was just throwing something around. He again requested to search the van, and Conner again declined. Officer Mayo then said, "You're telling me right now that there's dope in the van because you don't want me to search it. That's what you're telling me. The dog's going to come up here and hit on it if there is, that's what I'm saying." After Conner denied that there was anything in the van, reiterating that the van is not his, Officer Mayo said, "I've been told a hundred times you're slinging dope right now. That's what I've been told." After some more discussion,[9] Officer Mayo said, "All right, well we'll get a dog and as soon as he gets up here and does his thing you all will be good to go."

Officer Mayo then walked to the rear of the van and explained to one of the other officers who had arrived at the scene that they have to call another dog unit and that Conner is not letting him search the vehicle because "there's

_____

[8] Although the poor audio quality of the video makes it difficult to discern exactly what Officer Mayo said on the radio, it is apparent that he is requesting a canine. Also, it is impossible to tell whether Officer Mayo runs Garmon's license at this point, but he testified that he did so upon first returning to his vehicle.

[9] Because of the poor audio quality, it is difficult to tell what Conner and Mayo are discussing.

dope back there."[10] Officer Mayo then returned to his vehicle and placed a phone call, stating, "Where you at? I need your dog." This encounter—from the time Officer Mayo asked Conner what he moved in the back seat to the time Officer Mayo returned to his vehicle and placed the second call for a drug dog— lasted approximately six minutes.

The body camera footage did not capture anything for a while following this point. But Officer Mayo testified that he placed a call to another canine officer, Officer Nolan, who informed Officer Mayo that Conner had an active arrest warrant.[11] Officer Mayo testified that he then detained Conner pursuant to the warrant. The drug dog arrived at 8:34 p.m.—approximately seventeen minutes after Officer Mayo's request to Officer Nolan and thirty-one minutes after the traffic stop began.

Officer Mayo testified that the dog alerted on the driver and passenger sides of the van. The ensuing search of the van yielded 6.5 ounces of marijuana, of which Conner claimed ownership. Officer Mayo testified that, at that point, he conducted a field sobriety test of Garmon, which Garmon

---

[10] Specifically, Officer Mayo told the other officer that the reason Conner does not want him to search the vehicle is "because they got dope in there." He then stated "So, that's why we called for a canine unit. The bad thing is Johnny's off, which is one of our canine units from the Sherriff's office."

[11] Officer Mayo's testimony is somewhat conflicting on this point. At one point, he testified that Officer Nolan was the first canine officer he called. However, the body camera footage makes clear that Officer Mayo initially called for a canine unit the first time he returned to his cruiser, which occurred immediately after Officer Mayo questioned Conner about drug trafficking and stated, "All right, well give me a few minutes and we'll get the dog up here in a little bit." In any case, it is undisputed that Officer Mayo called Officer Nolan to request his canine at this moment, and that Officer Nolan informed Officer Mayo of Conner's arrest warrant during this call.

passed. Officer Mayo released Garmon and had the van towed away. In total, the stop lasted approximately an hour and twenty minutes.

Following the hearing, the trial court denied Conner's motion to suppress, concluding that Officer Mayo had not unlawfully prolonged the stop to accommodate the dog sniff. First, the trial court determined that any extension of the stop after Officer Mayo's discovery of Conner's arrest warrant was justified by his execution of the warrant. Second, the trial court found that Officer Mayo's knowledge of Conner's potential drug dealing, criminal history, and his witnessing Conner's movement inside the van during the stop provided reasonable suspicion sufficient to prolong the stop.

The Court of Appeals reversed the trial court, finding that Officer Mayo did not have reasonable, articulable suspicion of drug activity at the time he extended the stop to call for a drug dog. The Commonwealth moved this Court for discretionary review, which we granted.

## II. STANDARD OF REVIEW

"For motions to suppress the fruits of a warrantless search, '[t]he Commonwealth bears the burden of establishing the constitutional validity' of that search."[12] "When reviewing a trial court's ruling on a motion to suppress, the findings of fact are reviewed under a clearly erroneous standard, and the

---

[12] *Commonwealth v. Clayborne*, No. 2020-SC-0058-DG, ___S.W.3d___, 2021 WL 4487288, at *2 (Ky. Sept. 30) (quoting *Commonwealth v. Lane*, 553 S.W.3d 203, 206 (Ky. 2018)), *modified on reh'g*, ___S.W.3d___ (Ky. Dec. 16, 2021).

7

conclusions of law are reviewed de novo."[13] That is, "we affirm the trial court's findings of fact if those findings are supported by substantial evidence."[14] And, "if the court's findings of fact are supported by substantial evidence, we then conduct a de novo review of the court's application of the law to the facts."[15]

Further, because "the factual findings of the trial court in a suppression matter are conclusive so long as they are supported by substantial evidence . . . a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers."[16] "A finding of fact is clearly erroneous if it is not supported by substantial evidence; that is, evidence sufficient to induce conviction in the mind of a reasonable person."[17]

The trial court's factual findings in the present case are sparse, and a fair examination of those findings in the context of all the evidence presented at the suppression hearing reveals some inaccuracies. "Indeed, the trial court disregarded crucial undisputed testimony essential to the situation we address."[18]

For example, the trial court found that "Officer Mayo recognized the passenger to be [Conner] and believed that there was an outstanding arrest

---

[13] *Moberly v. Commonwealth*, 551 S.W.3d 26, 29 (Ky. 2018) (citing *Davis v. Commonwealth*, 484 S.W.3d 288, 290 (Ky. 2016)).

[14] *Turley v. Commonwealth*, 399 S.W.3d 412, 417 (Ky. 2013).

[15] *Id.* (citing *Commonwealth v. Pride*, 302 S.W.3d 43, 49 (Ky. 2010)).

[16] *Id.* (quoting *Commonwealth v. Ousley*, 393 S.W.3d 15, 22 (Ky. 2013)).

[17] *Id.* (citing *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003)).

[18] *Id.* at 418.

warrant for [Conner]." But Officer Mayo did not testify that he believed Conner had an outstanding arrest warrant at the point when he recognized Conner as the passenger in the van. Instead, Officer Mayo testified that he learned of the warrant when he contacted Officer Nolan to ask if he could provide a drug dog.

In another instance, the trial court found that "while running the license plate and checking to see if there was, in fact, an active arrest warrant for [Conner], Officer Mayo saw [Conner], through his cruiser windshield and into the back window of the vehicle, reach behind him and place something in a plastic bag behind the driver's seat." But Officer Mayo was not checking for Conner's arrest warrant at the time he observed Conner move something inside the van. Instead, Officer Mayo testified that he ran Garmon's license upon first returning to his vehicle, and his body camera footage reveals that he was calling for a drug dog during this period of time. Further, Officer Mayo testified that he did not run Garmon's license or check for a warrant until after he discovered from Officer Nolan that Conner potentially had an active arrest warrant—this discovery occurred *after* Officer Mayo observed Conner's movement inside the van.

We find particularly problematic the trial court's factual findings regarding Officer Mayo's reasonable, articulable suspicion of Conner's alleged drug trafficking. Specifically, the trial court found that

> Officer Mayo's knowledge of [Conner's] criminal history, the tip that [Conner] was dealing drugs, and [Mayo's] witnessing the movements of [Conner] in placing something behind the driver's seat, altered the initial purpose of the traffic stop into probable cause to investigate potential drug activity.

9

But the hearing record clearly demonstrates that Officer Mayo observed Conner's movements in the car only *after* initially questioning Conner about drug dealing, threatening the use of a drug dog if Conner did not give consent to search, and calling the first canine unit.

Only by disregarding portions of Officer Mayo's testimony and the body-camera footage could the trial court have made these findings. And the trial court's order contains few findings besides the inaccurate ones we note here. So the trial court's findings are at best incomplete and partially contradicted by the evidence produced at the suppression hearing. As a result, we cannot say that "the evidence selected by the trial court to support its findings . . . [has] sufficient probative value to induce conviction in the minds of reasonable persons."[19] The trial court's findings are therefore clearly erroneous when considering all of the evidence adduced at the suppression hearing.

Accordingly, "we use the facts elicited during [the suppression hearing] as the basis for our analysis" and "[w]e therefore progress to review de novo the motion to suppress as a matter of law."[20]

---

[19] *Id.* at 420.

[20] *Clayborne*, 2021 WL 4487288, at *4. This Court has, on multiple occasions, found it necessary to reject as clearly erroneous the trial court's findings on a suppression issue involving an unconstitutionally extended traffic stop. *See, e.g., Turley*, 399 S.W.3d at 420; *Clayborne*, 2021 WL 4487288, at *3-4.

10

## III. ANALYSIS

### A. The traffic stop was prolonged.

Conner moved to suppress the evidence discovered in the vehicle on the basis that it was the fruit of an illegal seizure. More specifically, Conner challenged the seizure's duration, arguing that the traffic stop was impermissibly extended for the officers to locate an available canine unit and perform a dog sniff on the van.

Seizures under the Fourth Amendment are analyzed sequentially, as "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."[21] "Traffic stops are analyzed under the *Terry v. Ohio*[22] framework because they are 'more akin to an investigative detention . . . than a custodial arrest.'"[23] "Its tolerable duration is determined by the seizure's 'mission,' which is to address the traffic violation that warranted the stop . . . and attend to related safety concerns."[24] This means, for example, that a "seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."[25] "If the traffic stop is prolonged beyond

---

[21] *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

[22] 392 U.S. 1 (1968).

[23] *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020).

[24] *United States v. Rodriguez*, 575 U.S. 348, 348 (2015).

[25] *Lott*, 954 F.3d at 923.

11

the time required for the purposes of the stop, 'the subsequent discovery of contraband is the product of an unconstitutional seizure.'"[26]

Law enforcement officers may only extend a traffic stop to conduct additional criminal investigations "if something happened during the stop to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot."[27] "Officers who pursue other purposes instead of those associated with the original mission of the stop for any amount of time unconstitutionally prolong the stop."[28] And "[t]here is no *de minimus* or reasonableness exception to the extension rule. Any unwarranted extension— no matter how short—without reasonable articulable suspicion violates the Fourth Amendment."[29] Further, an unreasonable extension of the traffic stop is unlawful whether it occurs before or after the officer has concluded his investigation into the traffic violation that warranted the stop. The critical question is simply whether the officer's pursuit of additional criminal investigations absent reasonable, articulable suspicion "'prolongs'—i.e., adds time to—'the stop[.]'"[30]

---

[26] *Davis*, 484 S.W.3d at 291 (citing *Epps v. Commonwealth*, 295 S.W.3d 807, 811 (Ky. 2009)).

[27] *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012) (citing *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005)).

[28] *Clayborne*, 2021 WL 4487288, at *4 (citing *Caballes*, 543 U.S. at 408).

[29] *Id.* (citing *Davis*, 484 S.W.3d at 294).

[30] *Davis*, 484 S.W.3d at 293 (quoting *Rodriguez*, 575 U.S. at 357). *See also United States v. Stepp*, 680 F.3d 651, 652 (6th Cir. 2012) ("Because a crafty officer, knowing [she cannot prolong a completed traffic stop] may simply delay writing a ticket for the initial traffic violation until after she has satisfied herself that all of her hunches were unfounded, we also treat the unreasonable extension of a not-yet-

Beyond investigating the potential traffic infraction that warranted the stop, an officer may pursue other "ordinary inquiries incident to [the traffic] stop."[31] Those inquiries typically include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."[32] Those inquiries "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly."[33]

However, "[e]ven minor police actions aimed at 'detecting evidence of ordinary criminal wrongdoing' or any purpose beyond addressing the traffic infraction are not tasks incident to the stop."[34] It is well-settled that a dog sniff "is a criminal investigation unrelated to addressing a traffic violation."[35] And for that reason, absent reasonable, articulable suspicion that criminal activity is afoot to justify that investigation, the prolonging of a traffic stop solely to accommodate a dog sniff is an illegal seizure.[36]

---

completed traffic stop as a seizure . . . [and] evaluate [it] . . . considering the totality of the circumstances.").

[31] *Rodriguez*, 575 U.S. at 356 (quoting *Caballes*, 543 U.S. at 408).

[32] *Id.* at 355.

[33] *Id.*

[34] *Lott*, 954 F.3d at 923.

[35] *Clayborne*, 2021 WL 4487288, at *4 (citing *Rodriguez*, 575 U.S. at 356 ("A dog sniff . . . is a measure aimed at detecting evidence of ordinary criminal wrongdoing . . . . Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission.")).

[36] *Rodriguez*, 575 U.S. at 355-57; *see also Davis*, 484 S.W.3d at 293; *United States v. Salas*, 820 F.App'x 405, 412 (6th Cir. 2020) ("An ordinary traffic stop, therefore, cannot be extended to accommodate a dog sniff without reasonable suspicion of criminal activity." (citing *Rodriguez*, 575 U.S. at 355)).

That said, officers may pursue unrelated investigative inquiries during a traffic stop if doing so does not *add time* to the stop. For example, when one officer continues to issue a traffic citation or perform other traffic-stop-related inquiries while another officer simultaneously conducts a dog sniff, the dog sniff is permissible because it does not add time to the stop.[37] "The United States Supreme Court determined in *Illinois v. Caballes* that a dog sniff executed concurrently with diligent traffic-related work did not unduly prolong the stop, even absent independent justification for the dog sniff."[38] And in *Rodriguez*, the Court later reaffirmed its holding in *Caballes*, stating that "[t]he Fourth Amendment may tolerate certain unrelated investigations that do not lengthen the roadside detention."[39] Again, the key question is whether the officer abandoned pursuit of permissible traffic-related inquiries in order to accommodate a dog sniff, thereby adding time to the overall duration of the traffic stop, and whether doing so was justified by reasonable, articulable suspicion.

On several occasions, this Court has held that an officer's extension of a traffic stop solely to accommodate a dog sniff, absent independent reasonable, articulable suspicion, resulted in an unconstitutional seizure of the driver or passenger. In *Davis v. Commonwealth*, this Court held that a dog-sniff search

---

[37] *See Clayborne*, 2021 WL 4487288, at *6 ("Had one officer continued issuing the citation while another officer simultaneously conducted a dog sniff, that search would have been permissible.").

[38] *Id.* (citing *Caballes*, 543 U.S. at 409).

[39] *Rodriguez*, 575 U.S. at 349 (citing *Caballes*, 543 U.S. at 407).

14

during a traffic stop was "clearly beyond the purpose"[40] of a stop for suspected

driving under the influence, "even though the Commonwealth argued that

finding out whether or not someone is under the influence is related to a

search for drugs that may have put the driver under the influence."[41]  Because

the officer had concluded his field-sobriety investigation and "shifted to a new

and different purpose" without reasonable, articulable suspicion, the extended

detention to accommodate the dog-sniff search was a Fourth Amendment

violation.[42]

In *Commonwealth v. Smith*,[43] an officer who had prior knowledge of

Smith's suspected drug dealing observed Smith fail to use his turn signal.[44]

The officer radioed a canine officer who then performed a traffic stop on Smith's

vehicle.[45]  The canine officer informed Smith that he was stopped for failure to

use his turn signal but then immediately asked Smith if there were drugs in

the car and commenced a sniff search around Smith's car.[46]  We determined

that "instead of diligently pursuing the purpose of the traffic stop, [the canine

officer] seemingly abandoned the legitimate purpose of issuing a traffic citation

because he immediately asked [Smith] about drugs and launched the dog's

---

[40] *Davis*, 484 S.W.3d at 294.

[41] *Clayborne*, 2021 WL 4487288, at *5.

[42] *Davis*, 484 S.W.3d at 294.

[43] 542 S.W.3d 276 (Ky. 2018).

[44] *Id.* at 278-79.

[45] *Id.* at 279.

[46] *Id.*

15

sniff search."[47] "Obviously, the search added time to the stop because it was conducted before the purpose of the stop was addressed."[48] Because the extension to investigate potential drug trafficking was unsupported by reasonable, articulable suspicion, we held that the stop was unconstitutionally extended.[49]

Similarly, in *Commonwealth v. Mitchell*,[50] an officer conducted a traffic stop after observing a car screeching its tires while exiting a parking lot, and another officer quickly joined the stop as backup.[51] After collecting the driver and passengers' licenses and completing background checks, "the officers had a discussion for another two to three minutes about whether to request a canine unit" and then made the request.[52] We determined that the officers had "deferred the completion of the stop beyond its original purpose to discuss and then request a canine search."[53] Noting that there is "no *de minimus* or 'reasonableness' exception" to the rule prohibiting delays attributed to actions unrelated to the purpose of the stop, we held that the officers' "discussion

---

[47] *Id.* at 283.

[48] *Id.*

[49] *Id.* at 284.

[50] 610 S.W.3d 263 (Ky. 2020).

[51] *Id.* at 266.

[52] *Id.*

[53] *Id.* at 270 (quoting *Mitchell v. Commonwealth*, 2017-CA-001539-MR, 2019 WL 258162, at *3 (Ky. App. Jan. 18, 2019)).

regarding summoning the canine unit impermissibly delayed completion of the stop."[54]

In this case, instead of diligently pursuing the legitimate purpose of the stop—investigating Garmon's erratic driving—Officer Mayo abandoned this mission when he repeatedly threatened the use of a dog sniff if Conner did not consent to a search of the van and then made multiple attempts to locate a drug dog. By Officer Mayo's own testimony, he wholly abandoned Garmon's potential traffic infraction that prompted the stop in order to investigate Conner's alleged drug trafficking and secure a drug dog.

Further, Officer Mayo's pursuit of this new mission obviously added time to the stop because it was conducted in lieu of any legitimate traffic-related inquiries. While Officer Mayo testified at the hearing that he ran Garmon's license upon first returning to his vehicle, the Commonwealth did not produce any evidence at the hearing to suggest—nor did it argue—that Garmon's license check was ongoing during the time that Mayo was threatening the use of a drug dog or making phone calls to secure a dog sniff. And the Commonwealth produced no testimony concerning the time it regularly took for Officer Mayo to conduct a license check. Instead, Officer Mayo testified that, upon realizing that Conner was the passenger and recalling the tip that Conner was trafficking methamphetamine, it "sparked [his] interest to investigate further." The record therefore provides no basis for concluding that the time

---

[54] *Id.*

17

Officer Mayo took to threaten Conner with a drug dog and locate a canine unit did not add time to the stop because concurrent, legitimate traffic-stop-related inquiries were ongoing.

Both the trial court's order and the Commonwealth suggest that any extension of the traffic stop was justified by Officer Mayo's discovery and execution of Conner's arrest warrant. We agree that an arrest warrant will provide reasonable suspicion to extend a traffic stop for some span of time. Recently, in *Rhoton v. Commonwealth,*[55] this Court held that an officer's discovery of an outstanding warrant during a traffic stop provides independent, reasonable suspicion to extend the stop for an amount of time reasonably necessary to address the outstanding warrant.[56] As such, we determined in *Rhoton* that the officer did not impermissibly extend the stop to conduct a dog sniff—any extension of time to accommodate the dog sniff occurred while the officer was addressing the outstanding warrant.[57]

But this argument in the present case overlooks the fact that Officer Mayo had abandoned any traffic-stop-related inquiries and switched to an investigation into drug activity well before he learned that Conner had an outstanding arrest warrant. Even in *Rhoton,* the trooper's efforts to locate a drug dog before his discovery of the active warrant occurred contemporaneously with ordinary traffic-related inquires. We noted that the

---

[55] 610 S.W.3d 273 (Ky. 2020).

[56] *Id.* at 278-79. We reiterated, however, that "this new purpose of the stop must be diligently pursued." *Id.* at 279.

[57] *Id.* at 278-79.

18

trooper "radioed for assistance from a nearby canine unit as he began preparing his citation" and that, in the meantime, the trooper "ran the ordinary records checks on Rhoton and his passenger, discovering the passenger had an unrelated active arrest warrant."[58] The drug dog "arrived 25 minutes after the initial traffic stop and while [the trooper] was still in his vehicle preparing Rhoton's citation and confirming information regarding the passenger's warrant."[59] Unlike the facts of *Rhoton*, the evidence elicited at the suppression hearing reveals that Officer Mayo *stopped* diligently pursuing the purpose of the traffic stop to conduct a criminal investigation into Conner's drug trafficking, and this included taking time to threaten the use of a drug dog and locate a canine unit well before Officer Mayo discovered Conner's arrest warrant.

Accordingly, we must conclude that Officer Mayo abandoned investigating Garmon's potential traffic violation before completing it in order to pursue a criminal investigation into Conner's alleged drug activity even before Officer Mayo discovered Conner's outstanding arrest warrant. By doing so, Officer Mayo extended the duration of the traffic stop.

### B. The Commonwealth failed to establish that the extension of the traffic stop was supported by reasonable, articulable suspicion.

Having determined that Officer Mayo extended the traffic stop in order to investigate Conner's alleged drug trafficking, we now turn to whether that

---

[58] *Id.* at 274.

[59] *Id.*

19

extension was supported by reasonable articulable suspicion. "We consider the totality of the circumstances to determine whether a particularized and objective basis existed for suspecting [Conner] of illegal [drug] activity."[60] When assessing the totality of the circumstances, "there is a 'demand for specificity in the information upon which police action is predicated.'"[61] "We consider the information from which a trained officer makes inferences, such as objective observations and the method of operation of certain kinds of criminals, and whether that information yields a particularized suspicion that the particular individual being stopped is engaged in wrongdoing."[62] While this "process does not deal with hard certainties, but with probabilities," reasonable suspicion is more than an "inarticulate hunch[.]"[63]

The Commonwealth asserts that Officer Mayo had reasonable articulable suspicion to extend the stop based on his knowledge of a tip that Conner had been dealing methamphetamine, his observation of Conner moving something in the backseat of the van, and his earlier traffic stop of Conner. We disagree.

When assessing whether an anonymous tip can provide reasonable, articulable suspicion, "we are required to examine the totality of the circumstances, and to determine whether the tip, once suitably corroborated,

---

[60] *Moberly*, 551 S.W.3d at 31 (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

[61] *Id.* (quoting *Terry*, 392 U.S. at 22 n.18.)

[62] *Id.* (citing *Cortez*, 449 U.S. at 417-18).

[63] *Terry*, 392 U.S. at 22.

provides sufficient indicia of reliability to justify an investigatory stop."[64]  For

example, in *Smith*, we disagreed with the Commonwealth's argument that the

officer's information from reliable confidential informants that Smith had

trafficked in cocaine provided reasonable suspicion of drug trafficking.[65]  There,

the informants provided Smith's name, alias, residence, vehicles, employment,

and the location at which Smith frequently trafficked cocaine.[66]  But we

rejected this argument because the officer had observed Smith for an extended

period of time on the day of the stop and did not observe any suspicious

activity consistent with drug dealing.[67]  We noted that there was no indication

that Smith was using his car to transport cocaine.[68]

By contrast, Officer Mayo testified merely that he "heard" that Conner

was trafficking methamphetamine.  And the Commonwealth did not elicit from

Officer Mayo any additional testimony regarding the anonymous tips, nor did it

demonstrate that Officer Mayo had made any attempt to corroborate such

information.  In its brief, the Commonwealth explains that "Officer Mayo noted

to the K-9 officer that 'one of [Conner's] buddies, David Ware' was trafficking

methamphetamine and the information he received was that Ware was the

person with whom Conner was trafficking."  But this fact does not demonstrate

---

[64] *Collins v. Commonwealth*, 142 S.W.3d 113, 115 (Ky. 2004) (citing *Alabama v. White*, 493 U.S. 325, 332 (1990)).

[65] 542 S.W.3d at 283-84.

[66] *Id.* at 293.

[67] *Id.* at 283-84.

[68] *Id.* at 284.

that the tip was suitably corroborated or that the tip carried sufficient indicia of reliability to support reasonable suspicion.

The Commonwealth cites to this Court's unpublished opinion in *Commonwealth v. Black*[69] to assert that anonymous tips alone may provide reasonable suspicion to justify an investigatory stop. While that proposition is true in a general sense, our opinion in *Black* does not support the Commonwealth's position. In that case, the anonymous tipster stated that "a black male riding a purple bicycle was selling drugs across from a Speedway at the corner of Georgetown Street and Glen Arvin."[70] The tipster described the man as "wearing a blue denim jacket and blue jeans" and mentioned that "the drugs were inside a newspaper the man was carrying."[71]

Citing to the United States Supreme Court's opinion in *Florida v. J.L.*,[72] we explained that "an anonymous tip that a person is carrying a gun is, without more, insufficient to justify a stop of that person."[73] But we found the anonymous tip was corroborated and therefore carried sufficient indicia of reliability to provide reasonable suspicion to justify the officer's investigatory stop.[74] Significantly, the officer observed that the appearance and location of the defendant and the fact he was carrying a newspaper were all consistent

---

[69] No. 2006-SC-000781-DG, 2007 WL 3226213 (Ky. Nov. 1, 2007).

[70] *Id.* at *1.

[71] *Id.*

[72] 529 U.S. 266 (2000).

[73] *Black*, 2007 WL 3226213, at *3.

[74] *Id.*

22

with the information provided by the tipster.[75] Moreover, the defendant was "in a high-crime area and acted furtively after observing the officer."[76]

Again, the record here is devoid of evidence that Officer Mayo's tipster provided any specific information about Conner's drug dealing that would allow Officer Mayo to corroborate the tip. Instead, the record demonstrates a bare tip that Conner was trafficking methamphetamine, which plainly lacks sufficient indicia of reliability to justify an investigatory stop.

Likewise, Officer Mayo's knowledge of his earlier traffic stop of Conner[77] did not provide reasonable suspicion to extend the stop. In *Smith*, we stated that "an officer's knowledge about a suspect's prior record can be a relevant factor in the reasonable suspicion analysis."[78] However, we noted that the officer's "knowledge that [Smith] had been convicted of and was then on parole for trafficking in cocaine does not support reasonable, articulable suspicion that he was in possession of cocaine at the time of the stop[.]"[79] Even coupled with confidential tips that Smith was known to be trafficking at a nearby bar, the officer's knowledge of Smith's drug trafficking history did not "create

---

[75] *Id.*

[76] *Id.*

[77] We assume Officer Mayo's testimony that he previously conducted a traffic stop of Conner and discovered that Conner was not allowed to drive formed the basis of the trial court's finding that Officer Mayo had reasonable suspicion to investigate drug activity during the stop in part because of his "knowledge of [Conner's] criminal history." There was no other discussion of Conner's criminal history at the hearing.

[78] *Smith*, 542 S.W.3d at 284 (quoting *Commonwealth v. Morgan*, 248 S.W.3d 538, 541 (Ky. 2008)).

[79] *Id.*

reasonable suspicion to conduct the stop, or to extend the otherwise lawful stop to conduct [a] search."[80] Officer Mayo's knowledge that he conducted a traffic stop on Conner weeks before this incident and discovered that Conner was not supposed to be driving plainly does not support reasonable, articulable suspicion that Conner was trafficking methamphetamine at the time of the stop.

Finally, Officer Mayo's observation of Conner's moving or shoving something into the back seat does not support reasonable, articulable suspicion, even coupled with Officer Mayo's knowledge of the anonymous tips and Conner's earlier traffic stop. It is true that "furtive gestures" indicating that a person is trying to hide something can be a relevant factor in the reasonable-suspicion analysis.[81] But we have never held that a passenger simply moving items during a traffic stop—coupled with essentially no additional factors—provides reasonable, articulable suspicion. The Commonwealth cites to *Commonwealth v. Priddy*[82] to support its argument. In that case, an officer was "flagged down by a citizen who told him a six-foot-tall, 170-pound white male with shoulder-length, black, curly hair, driving a late 1970s model black Ford truck with primer on the hood—was in the K-mart parking lot on 191 Outer Loop and was about to conduct a drug transaction."[83]

---

[80] *Id.*

[81] *See Moberly*, 551 S.W.3d at 32 (stating, in reasonable suspicion analysis, that the defendant made no "'furtive gestures' to indicate he was trying to hide something").

[82] 184 S.W.3d 501 (Ky. 2005).

[83] *Id.* at 503.

24

The officer quickly found the defendant leaving the parking lot. After following and stopping him, the officer observed the defendant frantically moving inside his vehicle, and he asked the defendant to exit the vehicle.[84]

We determined that the officer had reasonable, articulable suspicion to stop the defendant because the tip was sufficiently credible—the tipster had provided the information to the officer in-person, and the officer quickly corroborated that information by observing the defendant, his vehicle, and his location.[85] We then noted that the officer had not asked the defendant to exit his vehicle until he also witnessed the defendant's frantic activity inside of the car.[86]

By contrast, Officer Mayo's observation of Conner's movement in the vehicle stands virtually alone as a factor supporting reasonable suspicion. And Officer Mayo did not describe Conner's single movement as frantic or furtive. Simply put, Conner's behavior in placing something into the backseat during the traffic stop, even coupled with the anonymous tip and knowledge that Conner was prohibited from driving, does not create a reasonable, articulable suspicion that Conner was then and there engaged in drug activity.[87]

---

[84] *Id.* at 504.

[85] *Id.* at 511.

[86] *Id.*

[87] We note that, even if we were to find that Conner's moving something into the backseat of the van provided reasonable, articulable suspicion for Officer Mayo to investigate, that movement occurred *after* Mayo had already questioned Conner about drug dealing, threatened the use of a drug dog, and placed his first call to a canine unit. As such, the stop was impermissibly delayed even before Officer Mayo observed Conner's movement inside the vehicle.

In sum, we find that the Commonwealth failed to establish that Officer Mayo had reasonable, articulable suspicion to abandon the original mission of the traffic stop and investigate Conner's potential drug trafficking. With no reasonable, articulable suspicion justifying the extension of the traffic stop to accommodate a dog sniff, Officer Mayo prolonged the seizure and conducted the search in violation of Conner's Fourth Amendment protections.[88] The fruits of the search must be suppressed as a result.

## IV. CONCLUSION

For the foregoing reasons, the evidence obtained in the unlawful search of the van should have been suppressed. Accordingly, we affirm the opinion of the Court of Appeals and remand the matter to the trial court for further proceedings consistent with this opinion.

All sitting. Hughes, Keller, and Nickell, JJ., concur. Conley, Lambert, and VanMeter, JJ., concur in result only.

COUNSEL FOR APPELLANT:

Daniel J. Cameron
Attorney General of Kentucky

Matthew R. Krygiel
Assistant Attorney General
Office of the Solicitor General

---

[88] Additionally, Conner argues that Officer Mayo unconstitutionally extended the traffic stop in order to wait for the drug dog to arrive even after he was arrested pursuant to the arrest warrant. He asserts that Officer Mayo had completed his arrest but simply "waited around for the drug dog to arrive." Because we find that the stop was unconstitutionally extended even before Officer Mayo discovered and executed Conner's arrest warrant, we decline to address this argument.

COUNSEL FOR APPELLEE:

Molly Mattingly
Assistant Public Advocate