Stewart M. TURLEY, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2011–SC–000276–MR.

Supreme Court of Kentucky.

May 23, 2013.

54. *Id.* at 491.

Michael Romano Mazzoli, Scott Coleman Cox, Cox & Mazzoli, PLLC, Louisville, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Kenneth Wayne Riggs, Assistant Attorney General, Counsel for Appellee.

Opinion of the Court by Justice VENTERS.

Appellant, Stewart Turley, appeals as a matter of right, Ky. Const. § 110, from a judgment of the Muhlenberg Circuit Court convicting him of first-degree possession of a controlled substance, possession of marijuana, and of being a second-degree persistent felony offender, and sentencing him to a total of twenty years' imprisonment.

As grounds for relief Appellant contends, principally, that the trial court erred by denying his motion to suppress the drug-related evidence seized during a routine traffic stop because its discovery was the product of a custodial detainment which extended beyond the scope of the original purpose of the traffic stop in violation of the Fourth Amendment. *See Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.").

Because we conclude that the evidence was discovered after the purpose of the traffic stop had concluded, and no exception applied so as to permit the police officer to extend his encounter with Appellant beyond that time, we hold that the trial court erred in failing to suppress the illegally obtained drug evidence. Accordingly, we reverse Appellant's conviction and sentence and remand for additional proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL HISTORY

While on routine patrol in rural Muhlenberg County, Kentucky State Police

Trooper Jerry Knight observed Appellant speeding in a Ford F–150 extended-cab pickup truck. After following Appellant for a short distance, Knight also noticed that the license plate was improperly illuminated. As a result of these violations, he performed a traffic stop.

The truck, driven by Appellant, who was accompanied by two passengers, was customized with equipment that made it more difficult than usual to see into the cab of the truck. Knight asked Appellant to step out of the vehicle while the two passengers remained inside the truck. Appellant and Knight walked back to the police cruiser where the trooper subjected Appellant to a field sobriety test, which Appellant passed.

Appellant produced his driver's license and proof of registration. After Knight verified Appellant's driving status, he returned the documentation to Appellant and told him to "have a good night," thereby seemingly indicating that the purpose of the traffic stop was completed and that his seizure of Appellant had accordingly ended. Appellant for that reason returned to the cab of the vehicle.

Rather than going his separate way, as one ordinarily does after telling someone to "have a good night," Knight inconsistently returned with Appellant to the truck[1] and undertook a detention of the two passengers pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which permits a police officer to briefly detain a citizen if he has an individualized reasonable articulable suspicion that criminal activity is afoot. Knight testified that his reason for this detention was because he "just wanted to see who they were, make sure they are not any wanted person." Knight further testified that he planned to run a warrant check on the passengers, as was his customary practice

following a traffic stop. Significantly, Knight asserted no individualized reasonable articulable suspicion that the passengers were engaged in, or were about to engage in, criminal conduct so as to justify the *Terry* detention.

Knight testified in no uncertain terms that it was his objective intention to detain the truck and its occupants to inquire about the passengers, and that if Appellant had driven off he would have pursued him. Of course Knight's *Terry* detention of the two passengers had the collateral consequence of further restraining Appellant's liberty, he being a captive of the vehicle he was operating because it was occupied by the detained passengers.

During Trooper Knight's ensuing *Terry* questioning of the passengers, Appellant rested his arm on the center console of the truck. Near the console was a small wooden box that drew Trooper Knight's attention. Knight asked Appellant what the box contained, to which Appellant replied that he did not know because the box was not his. Knight then repeatedly demanded to be told what was in the box, and ultimately demanded to "see what was in the box."

Under the duress of these demands, Appellant began to open the box, which had a hinged lid. As it was positioned, the hinge was on the side facing Knight, so as Appellant lifted the lid with his left hand, Knight's view of Appellant's right hand was obstructed by the lid. Knight testified that he feared for his safety because the box may have contained a weapon, and so he quickly grabbed the box from Appellant's hand. As he did so, a bag of marijuana fell out.

---

1. *See Georgia v. Randolph,* 547 U.S. 103, 111, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006) (holding that social conventions may be relevant to Fourth Amendment analysis).

After discovering the marijuana, Knight immediately arrested Appellant, handcuffed him, and placed him in the police cruiser. Knight then radioed for backup to aid in controlling the scene. The trooper ordered the two passengers out of the truck, and directed them to sit on the ground near the truck so that he could search the vehicle. One of the passengers failed to comply with this request, so Trooper Knight arrested both passengers and placed them in his police cruiser with Appellant.

After backup arrived, Appellant's vehicle was searched. The search revealed a container of suspected methamphetamine located in the driver's front door, as well as pills later identified as oxaprozin; two loaded handguns directly behind the driver's seat; and $3,900.00 in cash in the center console.

As a result of the events, Appellant was indicted for, as relevant here, two counts of first-degree possession of a controlled substance, possession of marijuana, and of being a second-degree persistent felony offender.[2] The trial court denied Appellant's pretrial motion to suppress all of the evidence obtained from Appellant's vehicle as products of an illegal seizure. Following a trial on the charges, the jury found Appellant guilty of one count of first-degree possession of a controlled substance, possession of marijuana, and of being a second-degree persistent felony offender and recommended a total sentence of twenty years. The trial court entered a final judgment consistent with the jury's verdict and sentencing recommendation.

## II. SUPPRESSION ISSUES

In his pretrial motion to suppress the evidence obtained in the search, Appellant argued that the initial stop by Trooper Knight was for a traffic violation, and that the purpose of that stop had ended after the trooper had ascertained his identity, completed the sobriety test, returned his license and registration with no citation, and told him to "have a good night." He contended that because the purpose for the stop had been accomplished at that point, all of the events that followed, including the questioning of the two passengers, the discovery of the marijuana in the box, his arrest, and the search of his truck and the discovery of additional drugs, were all the product of an unlawful seizure. Therefore, all of the evidence seized subsequent to that juncture was fruit of the poisonous tree, and consequently inadmissible against him at trial.

In denying Appellant's motion to suppress, the trial court relied heavily on *United States v. Hunnicutt*, which holds that "[l]engthening the detention for further questioning beyond that related to the initial stop is permissible in two circumstances. First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring. Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." 135 F.3d 1345, 1349 (10th Cir.1998) (citations omitted). In its suppression order the trial court determined that the second exception identified in *Hunnicutt* applied, stating:

In the present action, after Trooper Knight returned the Defendant's license and other documentation to him, the subsequent conversation between the trooper and the vehicle's three occupants was a consensual encounter. At

2. Appellant was also indicted for possession of a handgun by a convicted felon; however, that charge was not tried along with the present drug charges.

that point, the Defendant did not have an objective reason to believe that he was not free to end the conversation with Trooper Knight and proceed on his way. In this instance, Trooper Knight did not constrain the Defendant by a coercive show of authority. Notably, Trooper Knight was the only officer on the scene at the time and was in fact "outnumbered" by the Defendant and the two passengers. Furthermore, the trooper did not display a weapon, physically engage the Defendant, or use commanding language that would have indicated compliance was required. In short, after returning the Defendant's documentation to him, Trooper Knight's subsequent questions concerning the contents of the box were not sufficient to render the otherwise consensual encounter coercive.

Having determined that Knight and Appellant were engaged in a consensual encounter at the time, the trial court further concluded that Knight was authorized to seize the box because when Appellant picked it up and opened it, Knight then had reasonable grounds to believe that Appellant may have been reaching for a weapon while attempting to open the box. Thus, the trial court concluded that the trooper was entitled to seize the box to protect himself pursuant to *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (permitting warrantless seizures under certain circumstances). The trial court further found that the search of Appellant's vehicle while Appellant was handcuffed in the police cruiser was valid under *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981),[3] as a search incident to arrest.

For the reasons stated below, we conclude that Trooper Knight had completed the purpose of the original stop before he

undertook to identify the passengers, and that his further interaction with Appellant and the passengers after that juncture was not a consensual encounter because, based on Knight's own testimony, his purpose for the continuation of the road-side encounter was to conduct a nonconsensual *Terry* detention of the passengers. Appellant's continued detention was a collateral consequence of that purpose. Moreover, it is clear that Knight's intended *Terry* encounter with the passengers was unsupported by an individualized reasonable articulable suspicion to justify undertaking such a detention. Therefore, all evidence seized after Trooper Knight accomplished the legitimate purpose of the traffic stop and said his good-byes to Appellant was seized illegally and is not subject to use against Appellant at trial.

### 1. *Standard of Review*

 Our standard of review of a circuit court ruling concerning suppression issues following a hearing consists of a two-pronged analysis. First, we will affirm the trial court's findings of fact if those findings are supported by substantial evidence. RCr 9.78. In this vein, we will only examine the trial court's findings for clear error and give deference to reasonable inferences made from the evidence. *Commonwealth v. Whitmore*, 92 S.W.3d 76, 79 (Ky.2002) (citing *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). Second, if the court's findings of fact are supported by substantial evidence, we then conduct a *de novo* review of the court's application of the law to the facts. *Commonwealth v. Pride*, 302 S.W.3d 43, 49 (Ky.2010).

 Because "the factual findings of the trial court in a suppression matter are conclusive so long as they are supported

---

**3.** *Overruled by Arizona v. Gant*, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009).

by substantial evidence ... a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Commonwealth v. Ousley*, 393 S.W.3d 15, 22 (Ky. 2013) (citations omitted). A finding of fact is clearly erroneous if it is not supported by substantial evidence; that is, evidence sufficient to induce conviction in the mind of a reasonable person. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky.2003).

### 2. The Trial Court's Factual Findings are Fatally Deficient and, Therefore, Not Conclusive in Our Review of the Suppression Issues

While most of the trial court's specific *historical* findings were supported by substantial evidence, a fair examination of them in context with all the evidence presented at the suppression hearing discloses a fundamental problem that overshadows the accuracy of those specific findings and discredits the array of findings in their totality. Indeed, the trial court disregarded crucial undisputed testimony essential to the situation we address. Moreover, many, if not all, of its *inferential* findings are wholly unsupported by substantial evidence and, therefore, clearly erroneous.

 Indeed the trial court appears to have disregarded portions of the testimony that establish Appellant was in custody when Trooper Knight re-approached the vehicle, rather than engaged in a consensual encounter. We therefore conclude that the trial court's findings of fact, in their totality, are incomplete, arbitrary, clearly erroneous in part, and, it follows, not conclusive in our review of Appellant's suppression arguments.

More specifically, the trial court's findings would have us believe that after stopping the truck and ascertaining Appellant's identity and sobriety, Trooper Knight simply stated to Appellant "have a good night" and sent him on his way, and that the resumption of his encounter with the occupants was entirely consensual. The trial court's order says:

> Trooper Knight verified the Defendant's driving status, returned the documentation to him, and then told Defendant, 'Have a good night.' The Defendant returned to the cab of the truck and started the engine. Trooper Knight then approached the vehicle again and began questioning the Defendant and the two passengers....

While the limited historical facts cited by the trial court may be supported by substantial evidence, nevertheless, Trooper Knight's suppression hearing testimony in its *totality* compels a substantially different conclusion than could fairly be drawn from such a limited consideration of the testimony. As the Commonwealth readily concedes, Trooper Knight objectively *did not* intend to terminate the encounter when he finished checking Appellant's credentials and sobriety. Rather, Knight testified that he escorted Appellant back to the truck, and admitted that "I *had* him get back in [the truck] and sit down ... behind the steering wheel." It should be self-evident that if a policeman *"had"* a motorist do something, the reasonable presumption is that he compelled the doing of the act, and that the subject's compliance was in response to the compulsion.

After placing Appellant back in to the truck and shutting the truck door, Trooper Knight turned his attention to the two passengers, thereby initiating a *Terry* encounter directed exclusively toward *them.* Indeed, the only reason he took Appellant back to the truck was so that he could retain control of Appellant while he interrogated the two passengers. He said, "It's easier to watch three people [in the truck]

rather than have to watch one person [in the police car] and then the two in the truck...." Trooper Knight agreed that after the initial stop, Appellant was never again free to leave, which is diametrically opposite of the trial court's finding.

After finishing his business with Appellant in the police car, Knight intended to, and did, proceed to question Appellant's passengers to "see who they were" and to "make sure they were not wanted persons." From this testimony it is clear that they, too, were not free to leave. In his testimony Knight clearly explained the extended detention: "Generally, I'll ask their passengers in vehicles for their license. I'll return to my cruiser, I'll run their driver's license and make sure they are not a wanted person." It is therefore clear that after concluding his original purpose for the stop—ascertaining Appellant's identity and sobriety status and resolving the speeding and license plate illumination issues—Trooper Knight then initiated a *Terry* encounter directed exclusively towards the two passengers. Of course, as a consequence of this, he continued Appellant's detention beyond the purpose of the original stop. Moreover, at this point Appellant was reduced to a mere bystander because Knight was engaging the passengers, not him; it follows that he was in no position to consent to a continued encounter, rather, he could only patiently await the conclusion of Knight's business with his seized passengers, lest he risk interfering with an ongoing police investigation.

Further, and perhaps most significantly, Trooper Knight candidly acknowledged that had Appellant exercised his supposed freedom to drive away before he had completed his task of indentifying the passengers and checking for warrants, Knight "definitely" would have chased him down and, presumably, arrested him. When asked if he then agreed that Appellant was *not* free to leave, Knight admitted: "That's correct." We find nothing of that in the trial court's findings.

Only by overlooking the foregoing undisputed testimony could the trial court have found that, "the Defendant did not have an objective reason to believe he was *not* free to end the conversation with Trooper Knight and proceed on his way." Furthermore, the trial court's suggestion that Appellant should have felt free to leave because he and his passengers "outnumbered" the trooper is simply untenable. We reject out of hand the notion that persons could reasonably believe that they were *not* in police custody simply because, by superior strength or numbers, they had the ability to overpower the police and flee.

The trial court's finding that Appellant, on his own unprompted volition, tried to open and reach inside the small box is also not supported by substantial evidence. The trial court finds that while "questioning the Defendant and the two passengers" Trooper Knight saw the box on the front seat and "he asked the Defendant what it contained. The Defendant stated that it was not his as he reached for it and began to open it." Had this been what actually occurred, regardless of the type of police encounter involved, Appellant's spontaneous opening of the box, which may have contained a weapon, might have justifiably provoked the trooper's concern about the contents of the box and justified his grabbing it away for safety purposes.[4]

---

4. *See United States v. Janis*, 387 F.3d 682 (8th Cir.2004) (holding that concern for safety of others allowed police to enter residence, where they discovered firearms in plain view); *United States v. Vance*, 53 F.3d 220, 222 (8th Cir.1995) (noting that a legitimate concern for safety of law enforcement officers or others constitutes exigent circumstances);

But, the evidence unerringly establishes that the trooper, prior to Appellant's picking up the box, had *demanded* to "see" the contents of the box. What is omitted from the trial court's explicit findings is Trooper Knight's testimony that he repeatedly, "several times," asked Appellant what was in the box, and each time Appellant denied knowing what was in it. Then, as Trooper Knight testified, *"I told him I wanted to see what's in the box."* Then, and only then, did Appellant attempt to pick up the box and open it. He plainly did so in response to the trooper's emphatic demand to "see what's in the box." Nowhere in its findings does the trial court disclose that the trooper was demanding that Appellant open the box.

▮▮ Thus, in their totality, the trial court's incomplete findings are arbitrary, clearly erroneous in their overall effect, and directly contradicted by the evidence viewed in its entirety. *Substantial evidence* means evidence that when "taken alone or in light of all the evidence, ... has sufficient probative value to induce conviction in the minds of reasonable men." *Asente*, 110 S.W.3d at 354 (footnote omitted). In "light of all the evidence," the evidence selected by the trial court to support its findings *does not have* sufficient probative value to induce conviction in the minds of reasonable persons. Indeed, there is no evidence *at all* to support the trial court's finding that Appellant was free to leave the scene and that his continued conversation with Trooper Knight was purely voluntary. Rather, the weight of the testimony presented at the suppression hearing decisively and unequivocally demonstrates that Appellant remained in custody after the purpose of the stop had ended, Trooper Knight said good-night, and re-approached the vehicle for the purpose of detaining and questioning mere standers-by to the original stop, the passengers.

### 3. As a Matter of Law, Appellant was in Custody at the Time Trooper Knight Asked what was in the Box

While our above discussion dispositively demonstrates that Appellant remained in custody throughout the stop as a *factual* matter, it is also clear that upon application of our well-established legal authorities Appellant remained in custody throughout that time *as a matter of law.*

▮ Custody occurs when police, by some form of physical force or show of authority, restrain the liberty of an individual. *Baker v. Commonwealth*, 5 S.W.3d 142, 145 (Ky.1999). The test is whether, considering the surrounding circumstances, a reasonable person would have believed he or she was free to leave. *Id.* (citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). The United States Supreme Court has identified several factors that suggest a seizure has occurred and that a suspect is in custody: the threatening presence of several officers; the display of a weapon by an officer; the physical touching of the suspect; and the use of tone of voice or language that would indicate that compliance with the officer's request would be compelled. *Mendenhall*, 446 U.S. at 544, 100 S.Ct. 1870; *Cecil v. Commonwealth*, 297 S.W.3d 12, 16 (Ky.2009). Other factors which have been used to deter-

---

*United States v. Antwine*, 873 F.2d 1144, 1147 (8th Cir.1989) (holding that search for firearm was permissible where officers witnessed defendant in possession of firearm and planned to leave children unattended in the home); *Warden v. Hayden*, 387 U.S. 294, 298– 99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) ("The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others.").

mine custody, in the context of *Miranda*,[5] a heightened level of custody in comparison to *Terry* custody, include:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*United States v. Salvo*, 133 F.3d 943, 950 (6th Cir.1998); *Smith v. Commonwealth*, 312 S.W.3d 353, 358–59 (Ky.2010) (discussing custody in the *Miranda* context).

As discussed in the previous section, it is uncontested that Appellant was in police custody when his vehicle was first stopped. The remaining question is whether that custody ended when Trooper Knight said, "Have a good night," and returned with Appellant to the truck. The undisputed suppression hearing testimony was that it remained Trooper Knight's *objective* purpose to continue to detain Appellant; and that, indeed, after bidding him "good night" it was Knight's intent to then undertake a *Terry* encounter directed at the passengers. It would have been obvious to a reasonable person cognizant and attuned to his surroundings that Knight was at that point undertaking additional detention of Appellant in order to question his passengers. To conclude under such circumstances that a reasonable person in Appellant's situation would subjectively believe he was free to leave, despite the trooper's unconcealed intention to the contrary, is clearly erroneous. As such, we have no difficulty in determining that application of the above authorities to the undisputed suppression hearing testimony unambiguously demonstrates that, as a matter of law, Appellant remained in custody at all times relevant to our review.

**4. Because the Detention of Appellant was Unjustifiably Prolonged, Suppression is Required**

Although an officer may detain a vehicle and its occupants in order to conduct an ordinary traffic stop, "any subsequent detention ... must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference." *United States v. Davis*, 430 F.3d 345, 353 (6th Cir.2005) (citation omitted).[6] Thus, an officer cannot detain a vehicle's occupants beyond completion of the purpose of the initial traffic stop "unless something happened during the stop to cause the officer to have a 'reasonable and articulable suspicion that criminal activity [is] afoot.'" *Id.* (citation omitted); *Butler v. Commonwealth*, 367 S.W.3d 609, 613 (Ky.App.2012); *see also United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir.1998) (holding that a stop may also be prolonged in the event of a sequential consensual police encounter). If he does, "the subsequent discovery of contraband is the product of an unconstitutional seizure." *Epps v. Com-*

---

**5.** *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (requiring that a suspect be informed of various constitutional rights prior to custodial interrogation).

**6.** *See also Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.").

*monwealth,* 295 S.W.3d 807, 811 (Ky.2009) (citation omitted).

Here, the trooper's purpose for the stop was to stop a speeder with an improperly illuminated plate, and to verify his sobriety, identity, and registration. Under the circumstances presented here, pursuant to *Butler,* once that task was completed, Knight had no authority to further detain the vehicle and its occupants.

▮ At the time Knight told Appellant to "have a good night" his reason for stopping Appellant's vehicle had been resolved and his legitimate mission had ended. The continued detention of Appellant and his passengers was never justified by any form of articulable suspicion. Indeed, based upon Trooper Knight's suppression hearing testimony, we in fact know why the policeman continued his control over Appellant and the passengers. Trooper Knight testified that his sole purpose for doing so was because it was his routine practice to detain passengers under these circumstances to see who they are, and determine if they are "wanted persons."

However, Knight had no authority to detain either Appellant or the passengers for that purpose. Historically, this has not been a country in which citizens are required to heel to the demand of a policeman to "show me your papers," nor will we indulge law enforcement conduct that leads us in that direction.[7]

Based upon the above principles, it is clear that the continued detention of Appellant after Trooper Knight said "good night" was unlawful, and that "the subsequent discovery of contraband [was] the product of an unconstitutional seizure." *See Epps,* 295 S.W.3d at 811 (citation omitted).

### 5. Knight's Re-approaching of the Vehicle was not a Consensual Encounter

▮ Because the point is central to the Commonwealth's argument in support of the trial court's holding, at the risk of redundancy, we separately address the trial court's conclusion that the period after Trooper Knight told Appellant to "have a good night" was a consensual encounter.

7. The recent Court of Appeals decision *Ward v. Commonwealth,* 345 S.W.3d 249, 252–53 (Ky.App.2011), includes the following statement: "In fact, Officer Mahan could ask the driver for his license and registration; request that the driver and passenger exit the vehicle; request that the occupants sit in the police cruiser; ask the driver about the purpose and destination of his travel; **and run a computer check to determine whether there were any outstanding warrants for the vehicle's occupants** or whether the vehicle had been reported stolen. *See, e.g., Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Owens v. Commonwealth,* 291 S.W.3d 704, 708 (Ky.2009)." (emphasis added). To the extent that this passage implies that a police officer may routinely request the passengers of a detained vehicle in a routine traffic stop to produce their identification for purposes of a warrant check, as explained herein, it is an incorrect statement of the law. *Delaware v. Prouse* does not address this issue at all but, rather, holds that except in those situations in which there is at least articulable and reasonable suspicion that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment; the term "warrant" does not even appear in the decision. *See* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660. Similarly, *Owens v. Commonwealth* is readily distinguishable from our case because that case considered the extent to which passengers may be patted down when the driver *has been found to have a crack pipe and is arrested. See* 291 S.W.3d 704. That case as well does not address detaining passengers to run a warrant check in the case of a routine traffic stop. Therefore, to the extent that *Ward* may be construed to hold that a passenger in a routine traffic stop may be detained for the purpose of the obtaining of his identification papers for the running of a warrant check, it is accordingly overruled.

The rule is clear that "[p]olice officers are free to approach anyone in public areas for any reason," because "[o]fficers are entitled to the same freedom of movement that the rest of society enjoys." *Commonwealth v. Banks*, 68 S.W.3d 347, 350 (Ky. 2001); *see also Royer*, 460 U.S. at 497, 103 S.Ct. 1319 ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.").

 However, it would produce an absurd result to apply this rule under the circumstances we address. First, as noted, the controlling rule is that a vehicle stop may last no longer than is required to accomplish the purpose of the stop. In such cases, the police officer is not casually engaging a pedestrian on the street with conversation; rather, the officer is encountering a citizen after disrupting his intended travel in a vehicle on a public highway by activation of his emergency equipment. Allowing a police officer to accomplish the purpose of the stop in such an intrusive manner with such a show of governmental authority and, at the same time, allowing him to routinely extend the stop at his own initiation by application of the consensual encounter rule would, in practice, eviscerate the constitutional principle that a stop may not be extended longer than is necessary to accomplish its purpose. The consensual encounter rule is limited to those freedoms of movement *that the rest of society enjoys.* Aside from police officers, virtually no other member of society has the authority or the opportunity to stop a moving motor vehicle, approach its occupants, and upon the con-

clusion of this compulsory encounter, continue his engagement with the occupants as a general consensual conversation. Accordingly, when a police officer undertakes such an encounter, he is engaging in conduct which an ordinary citizen may not. We therefore believe that in the usual case, once the purpose of a traffic stop has concluded, any follow-up conversation between the police and the detainee is presumed to be custodial [8] except when it was clearly shown to have been initiated by the motorist alone; otherwise, the rule against prolonging a traffic stop beyond its purpose is to a large extent undermined, if not eviscerated.

Moreover, in situations as we address here, many citizens do not perceive or understand a transition from a *Terry*-detention to a consensual encounter. Those who do must then make a decision that, as this case illustrates, can confound lawyers and judges: does the motorist risk being charged with the crime of resisting arrest or escape by assuming he is at liberty to leave and then doing so? Or, does he remain in place and create the appearance that he has consented to the continued intrusion upon his liberty? The stakes are too high for this Court to condone a police practice that fosters ambiguity about whether a suspect is "in custody." Our view in this regard is consistent with the legislative purpose of KRS 431.025, which requires an officer making an arrest to "inform the person about to be arrested of the intention to arrest him, and of the offense for which he is being arrested."

### 6. Any Exigent Circumstances Regarding the Box were Created by Trooper Knight

 While our discussion up to this point is dispositive, because the Common-

---

8. Such a presumption, of course, may be re- butted with appropriate evidence.

wealth relies heavily upon this point, and because the issue is squarely before us, we additionally address the argument that Trooper Knight's seizure of the box was proper as an exigent circumstance under the public safety exception to the warrant requirement based upon the theory that there may have been a weapon in the box which Appellant could then use against the trooper. As further explained below, a straight-forward application of *Kentucky v. King*, —— U.S. ——, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011), discloses that the Commonwealth may not rely upon the exigent circumstances exception to the warrant requirement under the circumstances presented because Trooper Knight himself created the exigent circumstances which lead to his seizure of the box by illegally extending the traffic stop, and by illegally insisting upon disclosure of the contents of the box.

 Trooper Knight offered no justification for his demand to know what was inside the small box on the front seat. Mere curiosity, of course, is not a legitimate basis to violate the rule against prolonging a traffic stop, nor, as further discussed below, violating the *Miranda* rule concerning custodial interrogation; nor to satisfy the requirements of the automobile exception, which permits a warrantless search of a vehicle, including closed containers, upon probable cause that contraband is concealed somewhere within the vehicle. *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). At the time of his inquiry, Trooper Knight had no right to know what was in the closed container, and he asserted none. The only rational basis for his concern about the contents of the box came about because of the policeman's own improper demand to know what was in it. When Appellant demurred, the trooper persisted. After repeated demands to know what was in the box, Trooper Knight in-

sisted "I want to see what's in the box." When Appellant attempted to comply with that demand the trooper seized the box. The trial court held that the seizure of the box was authorized under the doctrine of exigent circumstances. That holding is, however, precariously balanced upon its earlier conclusion that the extended detention of Appellant by Trooper Knight was constitutionally sound. As explained above, it was not; accordingly, *Kentucky v. King* forces the collapse of the exigent circumstance justification. Under *King*, a police-created exigency justifies a warrantless search only so long as the police conduct leading up to that exigency was lawful under the Fourth Amendment. 131 S.Ct. at 1858. As discussed above, Knight's extended detention of Appellant after the completion of his legitimate mission was a Fourth Amendment violation. The Commonwealth cannot thereafter justify an otherwise improper seizure on account of an exigency created by Knight's own conduct in demanding to see the contents of the box. It follows that the evidence subsequently obtained was subject to suppression. "Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion." *Segura v. United States*, 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984).

### III. CONCLUSION

For the foregoing reasons, the judgment of the Muhlenberg Circuit Court is reversed, and the cause is remanded for additional proceedings consistent with this opinion.

ABRAMSON, CUNNINGHAM, KELLER, NOBLE and SCOTT, JJ., concur. MINTON, C.J., concurs in result only.