RENDERED: MARCH 31, 2023; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1404-MR

DONNA WARFIELD                                              APPELLANT

v.         APPEAL FROM BOONE CIRCUIT COURT
           HONORABLE JAMES R. SCHRAND, II, JUDGE
           ACTION NO. 21-CR-00205

COMMONWEALTH OF KENTUCKY                                    APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: ACREE, CETRULO, AND GOODWINE, JUDGES.

ACREE, JUDGE: Appellant, Donna Warfield, appeals her judgement of

conviction based on her conditional guilty plea, entered in the Boone Circuit Court

on October 13, 2021, reserving her right to appeal the court's denial of her motion

to suppress evidence. We affirm.

## BACKGROUND

On February 3, 2021, at 2:09 p.m., Boone County Deputy Sheriff Teddy Melton observed a vehicle traveling a portion of interstate highway; neither the driver nor the passenger was wearing seatbelts. Deputy Melton initiated a stop.

Susan Hulett was driving the vehicle. Warfield was the passenger and the vehicle's owner. Deputy Melton asked both for identification and for the vehicle's registration and proof of insurance.

The deputy observed both women as they searched for the requested documentation. As Warfield looked in the glove compartment and her bags for the vehicle registration and insurance card, the deputy noticed one of Warfield's bags was blue with a lockable zipper closure, which he perceived to be a methadone bag. Such securable containers are used to facilitate "'take-home' use" of methadone doses by an outpatient of an opioid treatment program in a manner that will "limit the potential for diversion of opioid agonist treatment medications to the illicit market . . . ." 42 C.F.R.[1] § 8.12(i).

Deputy Melton asked where the women were going. Hulett explained they had gone to a methadone clinic in Georgetown, Kentucky, but it was closed; they then went to a methadone clinic in Northern Kentucky.

---

[1] Code of Federal Regulations.

Both women produced identification, but Warfield could not find, at first, proof of insurance for her vehicle. Deputy Melton returned to his cruiser to prepare citations for each woman for failure to wear seat belts. Before he could complete that task, he noticed Warfield holding documents out her window on the vehicle's passenger side. The deputy retrieved the documents, then returned to his cruiser to check and confirm the identifications he was provided.

He also searched for outstanding warrants and found none as to either Warfield or Hulett. Deputy Melton completed writing tickets for each of the women for failure to wear a seatbelt at 2:18 p.m. However, before the deputy finished writing the tickets and not later than 2:15 p.m., he contacted a City of Florence K-9 officer for assistance. The deputy's CourtNet search revealed Warfield had a pending case for trafficking in a controlled substance.

Before the K-9 officer arrived with a drug-sniffing dog, Deputy Melton finished writing and printing the tickets at 2:18 p.m. He then returned to Warfield's vehicle and asked Hulett to exit and step to the back of the vehicle for safety reasons while he explained the tickets. Hulett complied. Warfield remained in the vehicle. The deputy asked permission to search the vehicle but both Hulett and Warfield declined permission to do so.

During the short time after printing the tickets, the K-9 officer arrived with his dog. Thirteen minutes after Deputy Melton printed the tickets, and even

less time after he explained the tickets to Hulett and asked permission to search the vehicle, the canine alerted to the presence of drugs. It was 2:31 p.m.

Officers searched the vehicle and found a pill container Hulett owned containing cash in the amount of $200.00 and eleven hydrocodone pills and, in a coat pocket, a "bindle" – slang for a small package containing a narcotic – that appeared to be heroin powder. In the unlocked blue methadone bag, officers found a large quantity of fentanyl – approximately 88 grams of white powder, 5.5 grams of brown powder, 12.5 grams of a white crystal substance, and a digital scale. Warfield was arrested and soon indicted on several counts of trafficking and a count of being in possession of drug paraphernalia.

Warfield moved to suppress all evidence discovered in the vehicle as fruits of an illegally extended traffic stop. The motion was denied, and Warfield entered a conditional guilty plea to multiple counts resulting in a sentence of five years, probated for five years. By all accounts, after appealing the denial of her suppression motion as a matter of right, Warfield absconded and remains out of contact with her counsel and her probation officer. A probation violation warrant has been outstanding since March 8, 2022.

## STANDARD OF REVIEW

When reviewing the denial of a motion to suppress, an appellate court considers a trial court's findings of fact to be "conclusive if supported by

substantial evidence." *Bauder v. Commonwealth*, 299 S.W.3d 588, 591 (Ky. 2009) (citing *Ornelas v. United States*, 517 U.S. 690, 699, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996)). "Substantial evidence is 'that which, when taken alone or in light of all the evidence, has sufficient probative value to induce conviction in the mind of a reasonable person.'" *Hunter v. Mena*, 302 S.W.3d 93, 97 (Ky. App. 2010) (quoting *Bowling v. Nat'l Res. & Env't Prot. Cabinet*, 891 S.W.2d 406, 409 (Ky. App. 1994)). However, the appellate court conducts a *de novo* review of the trial court's application of law to its factual findings. *Commonwealth v. Jones*, 217 S.W.3d 190, 193 (Ky. 2006) (citation omitted).

## ANALYSIS

First, we address the Commonwealth's argument that the appeal should be dismissed because Warfield has absconded from justice. Counsel for Warfield addressed the argument in the reply brief as if addressing a motion to dismiss. We decide the issue by this Opinion, and not by separate order. We are not persuaded by the Commonwealth's argument and decline to dismiss the appeal for the following reasons.

Before 1976, neither the Kentucky Constitution nor the federal Constitution guaranteed to criminal defendants the right of appeal to a higher court. Our predecessor Court of Appeals made that clear in *Lake v. Commonwealth* when a criminal defendant, citing KY. CONST. § 11, argued he was entitled to appeal the

trial court's decisions on his juror challenges. 209 Ky. 832, 273 S.W. 511 (Ky. 1925). "[T]he error at the foundation of that contention[,]" said the Court, "is that it assumes that the constitutional guaranty [to 'a speedy public trial by an impartial jury of the vicinage[,]' KY. CONST. § 11] includes the right of the defendant in a criminal prosecution to an appeal . . . ." *Id.* at 835, 273 S.W. at 512. The Court then pointed out that "[w]e do not have the latter in our Constitution, nor is it in the federal Constitution . . . ." *Id.*

In 1976, the people of the Commonwealth amended the Kentucky Constitution to guarantee the right to appeal civil and criminal judgments to a second court, with certain exceptions inapplicable here. *Hoskins v. Maricle*, 150 S.W.3d 1, 6 n.1, 7 n.3 (Ky. 2004) (citing KY. CONST § 115).

Kentucky's constitutional guarantee predominates. It is the reason each of the Commonwealth's citations to case law for dismissing this appeal are inapplicable. The Commonwealth's authority falls into three categories.

The first category is comprised of cases decided before Kentucky's constitutional guarantee existed. For example, in *Wilson v. Commonwealth*, a case from 1874, Kentucky's then-lone appellate court dismissed a criminal appeal after the appellant escaped from confinement because there was no guarantee any decision by the court could be enforceable against the absconded appellant. 73 Ky. 526, 527 (1874). No citation is necessary to support the axiom that when the voice

and will of the people of the Commonwealth are expressed by their adoption of a constitutional amendment, all preceding inconsistent common law is constitutionally superseded.

In the second category of the Commonwealth's inapplicable cases, we find reference to federal case law expressing the "disentitlement theory" or "fugitive disentitlement doctrine" stemming from the Supreme Court's decision in *Molinaro v. New Jersey*, 396 U.S. 365, 90 S. Ct. 498, 24 L. Ed. 2d 586 (1970). This federal doctrine, "relies upon the theory that a fugitive from justice should not be able to use the judicial system while at the same time avoiding it." *United States v. Timbers Preserve, Routt Cnty., Colo.*, 999 F.2d 452, 453 (10th Cir. 1993).

The two paragraphs of the *per curiam Molinaro* decision is a succinct example of the federal Supreme Court's exercise of inherent authority to decline further discretionary review of a state court judgment. Molinaro did not pursue Supreme Court review as a matter of right guaranteed by any constitution because no such right exists. The nation's high court was reviewing Molinaro's case permissively upon its own writ of *certiorari*. Authority to manage its own docket was not hindered in any way by any constitution. This Court, however, is not at liberty to subordinate Section 115 of our Kentucky Constitution by reference to the common law "fugitive disentitlement doctrine," or as it is known, the "FDD."

Lastly, the Commonwealth notes Kentucky's Supreme Court, in fact, did apply the FDD in *Commonwealth v. Hess*, 628 S.W.3d 56 (Ky. 2021). But *Hess* is not the review of a criminal conviction; rather, it is the appeal from an order revoking probation.

Before her criminal trial, Hess was informed of "her constitutional right to appeal. She expressly waived that right and did not seek appellate review of her conviction. . . . With her constitutional right of appeal gone, any appeal thereafter must be statutorily based." *Id.* at 57, 60. "Hess' right to appeal was statutory under KRS[2] 22A.020(1)," said the Court and, therefore, "the issue of whether the FDD would deprive Hess of a *constitutional* right is moot." *Id.* at 60 (emphasis added).

The Commonwealth's reliance on *Hess* suggests that the case, like this Court's opinion in *Lemaster v. Commonwealth*, 399 S.W.3d 34 (Ky. App. 2013), might have been clearer. Understandably, it would have been dicta to answer the question *Hess* expressly declared moot. However, the question whether the FDD can be applied to deprive a defendant of the right guaranteed by Section 115 is now squarely before this Court.

We hold that no Kentucky court, for its own convenience or otherwise, has the authority to dispense with the constitutional right of appeal from

---

[2] Kentucky Revised Statute.

-8-

a criminal conviction guaranteed by KY. CONST. § 115 by applying the common law theory known as the fugitive disentitlement doctrine. If a criminal defendant asserts that right, the courts must respect it unless and until the defendant/appellant knowingly, voluntarily, and intelligently waives it.

*Hess* and *Lemaster* may have sown the seeds of doubt by citing Kentucky decisions prior to the 1976 constitutional amendment.[3] Although these older cases still apply to appeals not guaranteed by Section 115 (as in both *Hess* and *Lemaster*), those same older cases have been superseded to the extent they conflict with the subsequently adopted constitutional amendment.

Warfield's appeal of her criminal conviction was not waived. No rules of procedure have been violated that might justify dismissal. Finally, in light of KY. CONST. § 115, we cannot dispense with review based on the common law FDD. We turn now to evaluate the merits of Warfield's appeal.

Warfield argues the police improperly extended the stop beyond completion of the stop's purpose – to issue citations for failure to wear seatbelts. Delaying Warfield and Hulett from proceeding on their way after delivering the

---

[3] Both *Hess* and *Lemaster* cite *Molinaro* as the origin of the FDD. *Hess* cites the following cases rendered before the constitutional right existed in Kentucky: *Wilson*, *supra*; *Jackson v. Commonwealth*, 247 S.W.2d 52 (Ky. 1952); *Harris v. Commonwealth*, 311 Ky. 429, 224 S.W.2d 427 (1949); *Crum v. Commonwealth*, 232 Ky. 331, 23 S.W.2d 550 (1930); *Norton v. Commonwealth*, 78 Ky. 501 (1880). *Lemaster* cites: *Harris*, *supra*; and *Crum*, *supra*.

tickets, says Warfield, violated their constitutional rights.  We disagree and affirm the denial of the suppression motion.

"Like a *Terry*[4] stop, the tolerable duration of police inquiries in the traffic-stop context is determined by" both the time required to address the traffic violation which resulted in the stop and the time required to "attend to related safety concerns[.]"  *Rodriguez v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609, 1614, 191 L. Ed. 2d 492 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 837, 160 L. Ed. 2d 842 (2005)).  "Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed."  *Id*.  Such tasks include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Id*. at 355, 135 S. Ct. at 1615 (citing *Delaware v. Prouse*, 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)).  These inquiries do not include a canine drug sniff, which, "by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'"  *Id*. (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41, 121 S. Ct. 447, 454, 148 L. Ed. 2d 333 (2000)).

However, the evidence presented at the suppression hearing is that Deputy Melton's reasonable suspicions were raised when he saw the unlocked

---

[4] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

methadone bag and Warfield searching for her identification inside; Warfield's behavior caused him to believe she was under the influence of drugs or alcohol; and Hulett exhibited a greater than expected level of nervousness.

Deputy Melton's CourtNet search and drug dog search were not, *per se*, an unlawful extension of the traffic stop. An officer may extend a traffic stop beyond completion of its purpose when "'something happen[s] during the stop to cause the officer to have a reasonable and articulable suspicion that criminal activity [is] afoot.'" *Davis v. Commonwealth*, 484 S.W.3d 288, 292 (Ky. 2016) (quoting *Turley v. Commonwealth*, 399 S.W.3d 412, 421 (Ky. 2013)). That is, the suspected criminal activity must be independent of the reason for the traffic stop and the officer's suspicion must be sufficiently articulable and reasonable to distinguish the two. If not, "the prolonging of a traffic stop solely to accommodate a dog sniff is an illegal seizure . . . ." *Conner*, 636 S.W.3d 464, 474 (Ky. 2021) (citing *Rodriguez*, 575 U.S. at 355-57, 135 S. Ct. at 1615).

Deputy Melton's suspicion that drug-related criminal activity was afoot goes beyond observations found insufficient in *Moberly v. Commonwealth*, 551 S.W.3d 26 (Ky. 2018), cited by Warfield. In *Moberly*, the Supreme Court of Kentucky determined a police officer's observations of a nervous, sweaty vehicle operator did not give rise to a reasonable and articulable suspicion of illegal activity beyond what justified the officer's initial reason for the traffic stop. 551

S.W.3d at 31-33. The officer's delay in wrapping up the traffic stop was not justified because he "articulated nothing about [Moberly's] behaviors, individually or collectively, to connect him to criminal behavior beyond what may be ordinarily expected of a driver stopped for a traffic violation." *Id*. at 32. The Supreme Court noted that a driver is often nervous during a traffic stop. *Id*.

However, Deputy Melton's suspicions in this case include his observation of an unlocked and open methadone bag which his experience told him must remain closed and locked. He also believed Warfield's behavior was consistent with someone who is under the influence of drugs. "We consider the information from which a trained officer makes inferences, such as objective observations and the method of operation of certain kinds of criminals, and whether that information yields a particularized suspicion that the particular individual being stopped is engaged in wrongdoing." *Id*. at 31 (citing *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621 (1981)). Melton articulated to the trial court that he inferred, based on these observations and his experience and training, that drug-related activity was afoot and convinced the trial court the inference was reasonable. This Court cannot find error in the trial court's determination.

## CONCLUSION

For the foregoing reasons, we affirm Warfield's October 13, 2021 conditional guilty plea.


ALL CONCUR.


BRIEFS FOR APPELLANT:

Adam Meyer
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Melissa A. Pile
Assistant Attorney General
Frankfort, Kentucky