RENDERED: FEBRUARY 23, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0105-MR

MICHAEL W. CLAY                                                APPELLANT

APPEAL FROM FAYETTE CIRCUIT COURT
v.       HONORABLE LUCY ANNE VANMETER, JUDGE
ACTION NO. 21-CR-00528

COMMONWEALTH OF KENTUCKY                                        APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: GOODWINE, KAREM, AND McNEILL, JUDGES.

KAREM, JUDGE: Michael W. Clay entered a plea in Fayette Circuit Court conditioned upon his right to appeal the court's denial of his Motion to Suppress. Clay argues the circuit court erred by failing to suppress evidence recovered as a result of a drug sniff at a traffic stop. We disagree and affirm the circuit court for the reasons stated herein.

Further, during the pendency of the appeal, the Commonwealth moved to dismiss this appeal, and the motion was passed to this panel for review

on the merits.  After careful consideration, we deny the motion to dismiss the appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

At around 3:30 a.m. on February 27, 2021, Lexington Police Officer David Smith conducted a traffic stop of a vehicle for the driver's failure to use a turn signal.  Clay was a passenger in the vehicle's back seat.  As he was initiating the traffic stop, Officer Smith requested a K-9, who ultimately alerted on the vehicle's passenger door.  A search of the vehicle and its occupants uncovered cocaine and a handgun on Clay's person.

Prior to the traffic stop, Officer Smith had observed the subject vehicle other times that evening.  The first instance occurred at approximately 1:00 a.m. when Officer Smith observed the vehicle stopping at a stop sign for around fifteen (15) seconds with no other traffic.  Officer Smith ran the registration on the license plate and discovered the driver's identity, Wilrecus Strode.  When Officer Smith pulled up behind the vehicle, it drove away.  He found the lengthy stop unusual but continued his patrol.  However, Officer Smith looked up Strode's name on the Fayette County Detention Center's website and discovered that he had charges from 2018 for possession of narcotics and a charge for fleeing and evading the police.

Thereafter, at roughly 3:00 a.m., Officer Smith saw the vehicle stop in the middle of a one-way street for about fifteen (15) seconds. While two pedestrians were outside the subject vehicle conversing with the occupants, Officer Smith stated that he observed no physical hand-to-hand transactions between the parties. When Officer Smith pulled up to the car, the pedestrians walked away, and the vehicle left the area and drove toward Warfield Place.

Officer Smith later saw the vehicle pull onto Warfield Place and park in front of 804 Warfield Place. Officer Smith testified that Warfield Place is a dead-end street known for a high volume of narcotics trafficking, gang violence, and prostitution. Specifically, Officer Smith testified that the exact location of 804 Warfield Place, the location where the car was parked, was under active patrol due to complaints regarding drug trafficking and criminal activity. The vehicle was parked at Warfield Place for approximately twenty (20) minutes with its parking lights on; however, Officer Smith was not in a position to see if anyone entered or exited the vehicle at that location.

After the vehicle left 804 Warfield Place, Officer Smith observed a car traveling in the opposite direction of the subject vehicle. The other vehicle flashed its lights and pulled up next to the vehicle as if the drivers were going to have a conversation. At that time, a female departed Strode's vehicle and got into

the other car.  As Officer Smith's police cruiser pulled up, both vehicles left the area.

After that, the vehicle turned left onto Fifth Street without signaling. Officer Smith initiated a traffic stop.  He testified that he requested a K-9 unit before he exited his car to approach the subject vehicle.  Officer Smith requested the vehicle occupant's identification, and the occupants complied with his request. When asked, Strode told Officer Smith that he did not live in Lexington and was in town for his uncle's funeral.

Officer Smith further testified that, on first contact, he observed Clay in the back seat sitting in a "cramped and uncomfortable" position, giving Officer Smith the impression that he had recently entered the vehicle.  However, he testified that he never saw Clay enter or exit the vehicle at any time.

Officer Smith returned to his patrol car to run routine warrant checks and determined that none of the parties had active warrants.  Clay did have charges for possession of a handgun and drug paraphernalia from December 2019. However, Officer Smith did not look up whether Clay had been convicted of the charges.

While Officer Smith was running the warrant checks and before he began drafting a traffic warning notice for Strode, the K-9 officer arrived.  Officer Smith stopped his tasks and exited his patrol car to discuss the basis for the search

with the K-9 officer. Officer Smith again approached the vehicle to have the occupants step out of the car so that the K-9 could sniff the vehicle. As the occupants exited the vehicle, Officer Smith testified that he noticed that Clay had been sitting on part of a pizza box. He also noticed that Clay had his feet on a formal dress coat on the backseat floorboard giving Officer Smith the impression that Clay had jumped in the vehicle for a short ride. This was important to Officer Smith as he was trained that drug traffickers would often pick up a customer and ride them to a different location, a short distance away, to complete the drug transaction.

During the search, the K-9 alerted on the car's front passenger door, where the officers found a glass crack pipe. A subsequent search of the vehicle's occupants yielded a crack pipe, powdered cocaine, and a handgun on Clay's person. Ultimately, Officer Smith returned to his patrol car to finish drafting the traffic warning ticket, which he issued to Strode.

On May 17, 2021, a Fayette County Grand Jury indicted Clay for being a convicted felon in possession of a handgun, first-degree possession of a controlled substance, and possession of drug paraphernalia. On March 9, 2022, Clay filed a motion to suppress the search of his person. The circuit court held a suppression hearing on June 7, 2022, and issued an order denying the motion on July 21, 2022.

Clay subsequently entered a conditional guilty plea in January 2022, preserving his right to appeal the circuit court's denial of his suppression motion. The circuit court sentenced Clay to one year and one day's imprisonment. This appeal followed.

We will discuss further facts as they become relevant.

## ANALYSIS

### I.     Dismissal of Appeal

As previously discussed, the Commonwealth has moved our Court to dismiss this appeal under the Fugitive Disentitlement Doctrine ("FDD"), which "recognizes the principle that when a criminal defendant absconds and remains a fugitive during his or her appellate process, dismissal of the appeal is an appropriate sanction." *Commonwealth v. Hess*, 628 S.W.3d 56, 57 (Ky. 2021), *opinion modified on denial of reh'g* (Aug. 26, 2021). A motion panel passed the Commonwealth's motion to this merits panel in an order entered in October 2023.

As the basis for its motion, the Commonwealth detailed that, after filing his notice of appeal in this case in January 2023, Clay absconded from supervision in March 2023. Clay was later arrested in June 2023 and remained detained at the Fayette County Detention Center at the time the Commonwealth filed its motion to dismiss the appeal in July 2023.

We find the FDD is not applicable in this case and find the facts in *Hess* to be distinguishable from this case. First, the appellate court in *Hess* was not reviewing a criminal conviction on appeal but rather an appeal from an order revoking probation. Second, the defendant in *Hess* was informed of her constitutional right to appeal before her criminal trial, waived that right, and did not seek direct appellate review of her conviction. As stated by the *Hess* Court, "[w]ith her constitutional right of appeal gone, any appeal thereafter [was] statutorily based." *Id.* at 57, 60. Thus, because "Hess' right to appeal was statutory under KRS[1] 22A.020(1), the issue of whether the FDD would deprive Hess of a constitutional right is moot." *Id.* at 60.

However, in this case, Clay did not waive an appeal of his criminal conviction, expressly reserving the right to appeal the circuit court's denial of his motion to suppress in his guilty plea. "Ky. Const. § 115 confers to a defendant a single, direct appeal as a matter of right." *Hess*, 628 S.W.3d at 59-60 (citations omitted).

Considering Clay's right to appeal guaranteed under Section 115 of the Kentucky Constitution, we find the FDD inapplicable in this case and deny the Commonwealth's motion to dismiss this appeal. We now turn to evaluate the merits of Clay's appeal.

---

[1] Kentucky Revised Statutes.

## II.     Standard of Review

"When reviewing a ruling on a suppression motion, we defer to the trial court's findings of fact if they are not clearly erroneous.  Findings of fact are not clearly erroneous if they are supported by substantial evidence." *Commonwealth v. Jennings*, 490 S.W.3d 339, 346 (Ky. 2016) (citation omitted). Substantial evidence is "evidence sufficient to induce conviction in the mind of a reasonable person." *Turley v. Commonwealth*, 399 S.W.3d 412, 418 (Ky. 2013) (citation omitted).  "Based on those findings of fact, we must then conduct a *de novo* review of the trial court's application of the law to those facts to determine whether its decision is correct as a matter of law."  *Commonwealth v. Neal*, 84 S.W.3d 920, 923 (Ky. App. 2002) (footnote citations omitted).

## III.     Discussion

In this case, Clay does not dispute that Officer Smith's initial traffic stop was lawful.  *See, e.g.*, *Commonwealth v. Lane*, 553 S.W.3d 203, 205 (Ky. 2018) (citation omitted) ("A police officer is authorized to conduct a traffic stop when he or she reasonably believes that a traffic violation has occurred."). Nor does Clay or the Commonwealth take issue with the circuit court's determination that the stop was prolonged for a search by the K-9 unit.  Thus, the only issue on appeal is whether Officer Smith had reasonable suspicion to permit

the detention of the vehicle and Clay to perform the associated warrantless searches.

While "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop[,]" the officer may not perform such checks in a manner that "prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Carlisle v. Commonwealth*, 601 S.W.3d 168, 174 (Ky. 2020) (quoting *Rodriguez v. United States*, 575 U.S. 348, 355, 135 S. Ct. 1609, 1615, 191 L. Ed. 2d 492 (2015)). Otherwise, "the subsequent discovery of contraband is the product of an unconstitutional seizure." *Davis v. Commonwealth*, 484 S.W.3d 288, 292 (Ky. 2016) (citation omitted).

"We consider the totality of the circumstances to determine whether a particularized and objective basis existed for suspecting [Clay] of illegal activity." *Moberly v. Commonwealth*, 551 S.W.3d 26, 31 (Ky. 2018). When evaluating the totality of the circumstances, "there is a demand for specificity in the information upon which police action is predicated." *Id.* (internal quotation marks and citation omitted). A reasonable, articulable suspicion must be "more than an unparticularized suspicion or hunch." *Bauder v. Commonwealth*, 299 S.W.3d 588, 591 (Ky. 2009) (internal quotation marks and citations omitted).

This Court has recently decided two unpublished cases on the issue of reasonable, articulable suspicion with differing results, *Jones v. Commonwealth*,

No. 2018-CA-001181-MR, 2019 WL 2321654 (Ky. App. May 31, 2019), and

*Warfield v. Commonwealth*, No. 2021-CA-1404-MR, 2023 WL 2718970 (Ky.

App. Mar 31, 2023).[2]

In *Jones*, a Lexington Police officer observed a white van containing

three unknown occupants around 12:50 a.m. in an area identified as a "high

narcotics area." *Jones*, 2019 WL 2321654, at *1. The officer observed an

individual standing outside who approached the van and leaned into the vehicle to

speak with the driver. *Id.* When the observing officer pulled his vehicle closer to

the intersection, the van pulled away, prompting the officer's suspicions. *Id.* The

officer followed the van, ran the license plate number, and learned it was registered

to an individual in his forties, which did not match the apparent ages of the van's

occupants. *Id.* at *1.

The officer initiated a traffic stop based on an unilluminated license

plate. *Id.* Upon making contact with the occupants, the officer observed the driver

was nervous and his hands were shaking, while one passenger avoided eye contact.

*Id.* The officer identified the subjects and, after learning both had prior narcotics

and violent crime charges, requested dispatch of a K-9 unit to the scene. *Id.* An

officer removed the occupants from the vehicle, and the K-9 ultimately detected

---

[2] *Jones* and *Warfield* are cited only as persuasive authority pursuant to Kentucky Rule of
Appellate Procedure 41(A). Additionally, the Supreme Court has granted discretionary review
of *Warfield* on different grounds.

-10-

the presence of drugs. *Id.* A search of the van uncovered synthetic marijuana and a set of digital scales. *Id.* Jones, one of the car's occupants, told the officers that the synthetic marijuana belonged to him. *Id.*

In reversing and remanding the trial court's denial of Jones's motion to suppress, this Court noted the Kentucky Supreme Court's holding in *Turley* that "[a]n officer cannot detain a vehicle's occupants beyond completion of the purpose of the initial traffic stop unless something happened during the stop to cause the officer to have a reasonable and articulable suspicion that criminal activity [is] afoot." *Id.* at *3 (quoting *Turley*, 399 S.W.3d at 421 (internal quotation marks and citation omitted)); *see also Commonwealth v. Smith*, 542 S.W.3d 276, 282 (Ky. 2018).

Additionally, in reviewing the totality of the circumstances, the Court determined that the facts were "not sufficient to justify the extending the scope of the traffic stop beyond its original purpose." *Jones*, 2019 WL 2321654, at *4. These facts included the officer's earlier "observation of the van stopped in a high-narcotics area at a late hour; an individual leaning into the van; the van pulling away, possibly in an evasive manner, when the officer approached; and the apparent disparity in age between the occupants of the vehicle and the registered owner." *Id.* Nor was the subsequent information the officer gleaned – that Jones and the driver appeared nervous and had prior criminal charges – sufficient "to

-11-

abandon the original purpose of the stop . . . to commence a narcotics investigation." *Id*. at *3. *See also Moberly*, 551 S.W.3d at 33 (The defendant's "behavior during the traffic stop as articulated by the officer on the scene and the prior charge information . . . do not create a reasonable suspicion that [the defendant] was then and there engaged in illegal behavior beyond the apparently obvious traffic violations for which he was stopped.").

In the more recent case, *Warfield*, a Boone County Deputy Sheriff initiated a stop after observing two women, a driver and her passenger, failing to wear seat belts while traveling a portion of the interstate. 2023 WL 2718970, at *1. When asked for identification and vehicle documents the driver, Warfield, opened the glove compartment which allowed the deputy to observe bags which he perceived to be methadone bags. *Id.* The occupants of the vehicle explained they had gone to a methadone clinic in Georgetown, but it was closed. They then went to a methadone clinic in Northern Kentucky. *Id.* The women produced identification, but no insurance card, and the deputy returned to his cruiser to confirm the documentation and identifications he was given. *Id.*

> He also searched for outstanding warrants and found none as to either [of the car's occupants]. [The deputy] completed writing tickets for each of the women for failure to wear a seatbelt at 2:18 p.m. However, before the deputy finished writing the tickets and not later than 2:15 p.m., he contacted a City of Florence K-9 officer for assistance. The deputy's CourtNet search

-12-

revealed Warfield had a pending case for trafficking in a controlled substance.

Before the K-9 officer arrived with a drug-sniffing dog, [the deputy] finished writing and printing the tickets at 2:18 p.m. He then returned to Warfield's vehicle and asked [the passenger] to exit and step to the back of the vehicle for safety reasons while he explained the tickets. [The passenger] complied. Warfield remained in the vehicle. The deputy asked permission to search the vehicle but both . . . declined permission to do so.

During the short time after printing the tickets, the K-9 officer arrived with his dog. Thirteen minutes after [the deputy] printed the tickets, and even less time after he explained the tickets [to the passenger] and asked permission to search the vehicle, the canine alerted to the presence of drugs. It was 2:31 p.m.

*Id.* During the search the officers found pills, multiple forms of powdery substances, a crystallized substance, cash, and scales. *Id.* at *2. Warfield motioned the trial court to suppress this evidence arguing that the officer illegally prolonged the traffic stop beyond its original purpose. During the suppression hearing the deputy testified that he had a basis for reasonable, articulable suspicion that a crime was afoot. The deputy explained his "reasonable suspicions were raised when he saw the unlocked methadone bag . . . ; Warfield's behavior caused him to believe she was under the influence of drugs or alcohol; and [the passenger] exhibited a greater than expected level of nervousness". *Id.* at *4. In affirming the trial court's denial of the suppression motion, this Court found the deputy's inferences of criminal activity were reasonable. *Id.* at *5.

In the case *sub judice*, Officer Smith articulated suspicious facts that exceed that of either *Jones* or *Warfield.* The officer observed the subject vehicle four separate times in the wee hours of the morning prior to the stop. During the first encounter at 1:00 a.m., the vehicle was stopped in a high crime area at a stop sign for approximately 15 seconds with no other traffic around. When the officer pulled behind the vehicle it drove away. At roughly 3:00 a.m. the same vehicle was observed stopped in the middle of the road while two pedestrians were outside conversing with the occupants. Again, when Officer Smith pulled up the car drove away. The officer observed the subject vehicle a third time that evening parked for approximately 20 minutes in front of a house reported multiple times as having engaged in drug activity. Lastly, Officer Smith observed as a car traveling in the opposite direction of the subject vehicle flashed its lights seemingly indicating for the subject vehicle to stop. The subject vehicle pulled up to the oncoming vehicle allowing the drivers to converse and a passenger to exit and get into the approaching vehicle. Then, upon stopping the subject vehicle the officer observed Clay in the back seat in a precarious position raising the officers' suspicions that he was in the vehicle for the purposes of executing a drug transaction.

In our analysis, it is important to point out that, in addition to the observations listed above, the officer also relied on the fact that both Strode and Clay had prior criminal charges. Moreover, the trial judge also listed this factor as

a point upon which she relied in denying her motion to suppress. However, "[m]ere charges do not constitute a 'criminal history' upon which one might reasonably suspect future criminal behavior." *Moberly*, 551 S.W.3d at 33. Thus, this Court will not factor that information into the equation used to determine reasonable suspicion in this case. However, even disregarding this point, we agree with the trial court. Looking at the totality of the circumstances, the observations of Officer Smith formed a basis for reasonable, articulable suspicion to allow a deviation from the original purpose of the traffic stop and provide the basis of the subsequent warrantless search. "We consider the information from which a trained officer makes inferences, such as objective observations and the method of operation of certain kinds of criminals, and whether that information yields a particularized suspicion that the particular individual being stopped is engaged in wrongdoing." *Moberly*, 551 S.W.3d at 31 (citing *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621 (1981)).

## CONCLUSION

For the foregoing reasons, we affirm the decision of the Fayette Circuit Court.

ALL CONCUR.

-15-

BRIEFS FOR APPELLANT:

Erin Hoffman Yang
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Jenny L. Sanders
Assistant Attorney General
Frankfort, Kentucky